705 So.2d 1076 (1997)
STATE of Louisiana
v.
James S. BALDWIN, IV.
No. 96-KA-1660.
Supreme Court of Louisiana.
December 12, 1997.
Rehearing Denied January 30, 1998.
Daryl Gold, Shreveport, for Applicant.
Richard P. Ieyoub, Atty. Gen., Don M. Burkett, Dist. Atty., Clifford R. Strider, III, for Respondent.
LEMMON, Justice.[*]
This is a direct appeal to this court from a conviction of four counts of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issue is the sufficiency of the evidence supporting the four convictions of first degree murder.[1]

Facts
On July 14, 1994, defendant's wife sought treatment in the hospital emergency room for injuries sustained in a beating inflicted by defendant. She filed criminal complaints against him for domestic violence and battery, and she left him for the last time after eight years of marital strife and violence. Defendant was arrested July 15.
During the following week, defendant spoke openly to three persons, including two law enforcement officers, of his plans to kill his wife and the three men with whom she was associating, J.O. Woodfin, Rocky Baggott and Volley Jack Grimsley.[2] He also *1077 implied more obliquely to a fourth person that he planned violence to his wife and the three men.[3]
On July 21, defendant purchased a shotgun. After he had sawed off a segment of the gun, he consulted a friend about fixing a sight on the gun, but the friend declined to do so.[4] Defendant performed some modifications himself, adding a sling to the weapon and removing the plug, thereby allowing six shells to be fired consecutively without reloading.
At around 9:30 p.m. on July 23, defendant drove to Woodfin's home armed with his modified shotgun where he shot and killed his wife and the three men. According to two of Woodfin's children, Justin (aged nine) and Oren (aged ten), defendant first shot Woodfin and Baggott in the yard. Then defendant went inside the trailer and shot his wife and Grimsley.
The Woodfin boys testified that their father, upon defendant's arrival, retrieved his SKS rifle and went into the yard. When Baggott joined Woodfin in walking toward defendant's car, defendant got out and stood behind the driver's door. According to the boys, their father cursed at defendant, ordered him to leave twice, and then fired two shots with his rifle into the air. After the three men talked briefly, defendant shot Woodfin and Baggott with the shotgun. Defendant then entered the trailer and shot twice. One of the boys found Grimsley with "half his face ... blown off" and a rifle near him on the floor. The boys ran from the trailer into the woods toward the home of their neighbor, Archie Merrill. As they ran, they heard another shot.
Merrill, who had spent four years in the Marines as a rifleman and sniper, testified he heard yelling and shouting from the Woodfin property, about two hundred yards away. Merrill heard Woodfin twice shout obscenities at someone to get out of his yard. After a two-to-three second pause, Merrill heard two shots from an SKS rifle.[5] Then, following another pause of several seconds, he heard two blasts of a shotgun, one right after the other. Less than a minute later, the Woodfin boys arrived, scared and crying, that "they killed my daddy, they killed Rocky, they killed Jack, they killed everybody." One of the boys named the defendant as killer.
After the arrest, the defense requested a sanity hearing. The trial judge ruled that defendant was competent to proceed.
Following the guilt phase, the jury found the defendant guilty of four counts of first degree murder. A sentencing hearing was then held, and the jury recommended a sentence of death, on each count, finding as aggravating circumstances that defendant knowingly created the risk of death or great bodily harm to more than one person and that the killing occurred during the perpetration of an aggravated burglary.
After the trial judge pronounced the death sentence, defendant filed this appeal.

Sufficiency of the Evidence
Defendant contends that the evidence, even when viewed in the light most *1078 favorable to the prosecution as required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not prove that the killings of Woodfin and Baggott were not justified. Defendant further contends that the evidence, at best, supports only manslaughter convictions for the deaths of his wife and Grimsley.
When an accused raises justification as a defense to a charge of murder, the state must prove beyond a reasonable doubt that the killing was not justified. La.Rev.Stat. 14:18-22; State v. Scales, 93-2003, p. 14-15 (La.5/22/95), 655 So.2d 1326, 1336. La.Rev. Stat. 14:20 A(1) provides that a killing is justified "by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." A person who is the aggressor or brings on a difficulty cannot claim self-defense. La.Rev.Stat. 14:21; State v. Scales, supra. The standard on appellate review is whether the evidence, viewed by a rational juror in the light most favorable to the prosecution, established beyond a reasonable doubt that the killing was not justified. State v. Lynch, 436 So.2d 567 (La.1983).
As to Woodfin, three witnesses, Woodfin's sons and Merrill, testified that he fired the SKS rifle into the air after twice ordering defendant off his property. Merrill knew Woodfin about two years as a neighbor, but did not associate with any of the men and did not consider them friends. He had not met Elizabeth Baldwin. A former Marine rifleman, Merrill testified that he heard bullets whistling through the air simultaneously with the firing of the SKS that night. He also provided the context and time frame in which the SKS and the shotgun were fired. He heard Woodfin cursing and ordering someone from his yard, then murmurs, followed by more shouted orders from Woodfin to leave. Two or three seconds later, the SKS was fired, followed by two shotgun blasts two or three seconds after the rifle shots.
If credited by factfinders, the foregoing evidence established that Woodfin attempted to get defendant to leave, not to kill him. While defendant testified that Woodfin was advancing and firing directly at him, all the while threatening to kill him, the testimony of the other witnesses, apparently credited by the jury, established that deadly force was not necessary to avoid the danger represented by Woodfin. All defendant had to do was get in his car and leave, the precise conduct Woodfin was vociferously urging.
Defendant points out that the Woodfin boys did not see him with a gun when he left his car. Despite that fact, however, the brief span between the discharge of the SKS and the discharge of the shotgun provided jurors with an evidentiary basis for deciding that no one in defendant's position could have held a reasonable belief that he was both in immediate danger of death or great bodily harm and that killing was necessary to extricate himself.[6] Viewing the evidence in the light most favorable to the state, a rational juror could have found beyond a reasonable doubt that the killing of Woodfin was not done in self-defense.
Baggott was shot immediately after defendant shot Woodfin. Defendant testified that he, as a matter of habit, chambered a round after discharging the first shot. He was afraid of the unarmed Baggott, who held a black belt in karate, and fired when Baggott charged him.
Medical and forensic evidence establishing that Baggott was eight to ten feet away when defendant fired. The fact that Baggott was shot in the right side of his stomach, with numerous pellets exiting on the left side, suggests that Baggott was turned or turning when he was wounded and was not coming at defendant.
Based on the evidence that defendant shot Baggott immediately after killing Woodfin and on the medical and forensic evidence, a rational juror could have found beyond a *1079 reasonable doubt that the killing was not in self-defense. La.Rev.Stat. 14:20 A(1); State v. Scales, supra.
As to Grimsley and defendant's wife, defendant testified that he entered the trailer pursuant to Baggott's request to telephone for emergency medical assistance. He took one or two steps down the hall toward the kitchen when he spotted Grimsley, in the living room at the end of the hall, down on a knee with a shotgun at his shoulder aimed at defendant. When defendant said "don't," Grimsley continued to position the gun adversely, and defendant fired. The first shot struck Grimsley in the chest and "rocked" him, but did not keep him from raising the weapon again. Defendant then shot him above the right eye with a slug.
Defendant attempted to telephone for help, but returned to the yard when Baggott began shouting. After checking on Baggott and attempting to spot his wife with headlights from his car, defendant returned to the trailer, walked down the hall, and entered the living room. He then saw his wife across the room, holding the same shotgun Grimsley had held earlier. His wife had the gun at her shoulder, but her finger was not on the trigger. Defendant told her, "don't," but when she continued to reach for the pistol grip, defendant moved across Grimsley's body and shot his wife.
The jurors reasonably could have rejected the entirety of defendant's testimony. There were no fingerprints on the shotgun found in the living room between the bodies of defendant's wife and Grimsley, or on the three shells the gun contained. The pathologist determined that both of Grimsley's wounds were fatal, but could not tell which wound came first. Along the outside of Grimsley's left hand, wrist and forearm was an area of stippling, small red spots on the skin where filler material or wadding hit, which the pathologist attributed to Grimsley's either holding his left arm across his chest at the moment defendant fired the buckshot round (which would explain an area on Grimsley's chest relatively free of pellet wounds), or holding his arm over his stomach. The pathologist opined that the slug which hit Grimsley's head was fired from three or four feet away, but crime lab analysis revealed that Grimsley was shot in the chest from a distance of fourteen to nineteen feet.
On this evidence, the jurors reasonably could have accepted the prosecutor's arguments in closing that Grimsley's chest wounds would have exhibited a different pattern if he had been holding a weapon and that the shotgun Grimsley was supposed to have been holding when defendant fired the buckshot round was unscathed.
The pathologist also determined that defendant's wife was killed by a contact wound, meaning that defendant put the barrel of the sawed-off shotgun against his wife's skin and pulled the trigger.
Manslaughter is a homicide which would be either first or second degree murder except that the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his or her self-control and cool reflection. La.Rev.Stat. 14:31 A(1); State v. Lombard, 486 So.2d 106, 110-11 (La.1986). The presence of "sudden passion" and "heat of blood" distinguishes the offense from murder. These are mitigatory factors in the nature of a defense which, if established by a preponderance of the evidence, exhibit a degree of culpability less than that present when a homicide is committed in the absence of these factors. State v. Lombard, supra. Notably, "[p]rovocation shall not reduce the homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled...." La.Rev.Stat. 14:31 A(1).
The jurors reasonably could have concluded there was no immediate provocation sufficient to deprive an average person of self-control and cool reflection in the events leading up to the deaths of Grimsley and defendant's wife. The absence of fingerprints and pellet marks on the shotgun Grimsley allegedly was pointing at defendant supports an inference that Grimsley did not have the weapon between himself and defendant when defendant fired. Having killed Grimsley, defendant then took time to calmly move his car about, throwing the headlights here and *1080 there, trying to spot his wife in the woods around the house. He twice backed down the driveway to realign the car, maneuvers which would have been time-consuming. The jurors reasonably could have concluded that an average person's blood would have cooled before defendant shot his wife.
The medical and forensic evidence, together with defendant's own account of his behavior, provide ample basis for a conclusion as to Grimsley and defendant's wife that defendant did not kill in self-defense and that the mitigatory factors of "sudden passion" and "heat of blood" were not proved by a preponderance of the evidence.
The evidence fully supports the jurors' apparent findings that the defendant armed himself with a particularly gruesome weapon and sought out the four persons he had been threatening to kill for a week. He located them and, in rapid fashion, killed them one by one, acting with specific intent to kill.
The circumstances of the murders clearly demonstrate that defendant had specific intent to kill or inflict great bodily harm upon more than one person. He contemplated and actually caused the death of one person and the risk of death or great bodily harm to at least one other person by a series of acts during a single criminal episode or transaction. On this evidence, a rational juror could have found that all the elements of La.Rev. Stat. 14:30 A(3) had been proved beyond a reasonable doubt on each of four counts. Jackson v. Virginia, supra.

CAPITAL SENTENCE REVIEW
Pursuant to La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to statutory aggravating circumstances; and whether the sentence is disproportionate, considering both the offense and the offender.
Defendant is a white male who was thirty-seven years old at commission of the murders. He knew his victims. One was his estranged wife, and he had been friends with the others, including Woodfin, with whom his wife was staying. Defendant had never served in the armed forces. He was knowledgeable about guns and owned guns throughout his life.
According to the Capital Sentencing Investigation Report, defendant's employment history was poor. His last reported employment was for six months as a millwright.
Defendant was born in Orange, Texas, the only son of Doris and James Baldwin. His father died in 1987. Defendant was married once before, with one child born of that union.
Defendant married Elizabeth Dollar in 1986. Two children were born of the union, Samantha and Jamie, both of whom appeared at the penalty phase and asked the jury to spare their father's life. Defendant's mother has had custody of the children since 1993.
Defendant's prior criminal record included a conviction for attempted simple burglary in 1977, when he was nineteen years old. He received three years probation, which was satisfied May 11, 1980. He had a number of arrests and had been fined for constructive contempt.
Defendant is a high school graduate. He has no history of mental or emotional difficulties. Sanity commission doctors examined him prior to trial and found that he was able to assist counsel and had not been insane at commission of the offense.

Passion, Prejudice or Arbitrary Factor
Defendant reurges complaints relative to the outburst in the courtroom, discussed in the appendix. The trial judge took immediate steps to quell the disturbance and later charged the jurors not to be swayed by sympathy, passion or public opinion. The outburst at the guilt phase did not inject an arbitrary factor into the proceeding.
As to whether passions were running high in the community, the record of voir dire resolves the matter definitively. While all but three prospective jurors had heard of the murders, only two held preconceived opinions respecting guilt or punishment, and they were disqualified.
*1081 The defense presented testimony from defendant's mother and from defendant's two children in the custody of his mother. The mother testified that they needed him. One of the children asked the jurors to vote for life imprisonment, and the other testified she just wanted her father to come home.
The state introduced no victim impact evidence.

Aggravating Circumstances
The state urged two statutory aggravating circumstances: (1) that the offender knowingly created a risk of death or great bodily harm to more than one person, and (2) that the killings occurred during the perpetration or attempted perpetration of an aggravated burglary. La.Code Crim. Proc. art. 905.4 A(1), (4). The jury found the two circumstances on each of four counts.
As noted in the guilt phase, the evidence established beyond a reasonable doubt that defendant knowingly created a risk of death or great bodily harm to more than one person. This aggravating circumstance exists when the offender, in a single consecutive course of conduct, contemplates and actually causes the death of one person and the risk of death or great bodily harm to at least one other person. State v. Roy, 95-0638 p. 19 (La.10/4/96), 681 So.2d 1230, 1242.
Aggravated burglary includes an unauthorized entering of an inhabited dwelling with the intent to commit a felony, while the offender is armed with a dangerous weapon. La.Rev.Stat. 14:60(1). There is no reasonable doubt that the murders in the trailer were committed in the course of an aggravated burglary.
A closer question is whether the murders of Woodfin and Baggott, which occurred in the yard, can be said to have occurred during the course of the burglary. Nevertheless, even if the evidence did not support a finding that the killings of Woodfin and Baggott were committed in the perpetration of an aggravated burglary, the failure of one statutory circumstance does not invalidate others, properly found, unless the evidence introduced in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 201, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
In the present case, evidence of defendant's entry into the trailer with felonious intent was independently admissible to establish the charged offense of first degree murders on the counts involving Grimsley and defendant's wife, and that evidence did not inject arbitrariness into the proceedings.

Proportionality
Pursuant to La. Sup.Ct. R. 28, § 4(b), the prosecutor filed a list of each first degree murder case tried after January 1, 1976, in the judicial district. The list shows no comparable crimes in the district.
On a statewide basis, three crimes resemble this case: State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756; State v. Lowenfield, 495 So.2d 1245, 1256-1257 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986); and State v. Welcome, 458 So.2d 1235 (La.1983).
In Koon, defendant and his wife had a stormy history, marked with estrangements and separations. The wife left after defendant took ten months off from work and after she learned that he had not paid a tax lien. She returned to her parents' home. Defendant disliked his wife's parents because of perceived interference with his marriage to their daughter. After a week, the wife sued defendant for divorce and for a division of property. Enraged, he armed himself with a semi-automatic pistol and drove to the home of his wife's parents. Seeing his wife in the yard, defendant walked directly to the fence and shot her in the back. He walked nearer and shot her in the head again as she lay on the ground. Reversing his steps, he entered the parents' home and shot both of them.
Koon was white, had served in the Army, had married three times and had a total of five children, and had no juvenile record and no felony arrests or convictions as an adult. He had no psychosis or neurological deficits, although he abused drugs and alcohol. A defense psychologist diagnosed mild brain dysfunction from years of multiple substance addiction.
This court affirmed the conviction and sentence, concluding that the evidence supported *1082 aggravating circumstances that he knowingly created a risk of death or great bodily harm to more than one person on all counts, and, as to the parents, that the murders occurred during the perpetration of an aggravated burglary.
In Lowenfield, the defendant moved in with his girlfriend and her young infant. Their affair was stormy, and the woman soon left to return to her mother's home. Bearing a grudge against the woman's family for perceived interference in their relationship, defendant armed himself and hid inside the girlfriend's mother's home. After family members had gathered, the defendant suddenly jumped out and began firing with a pistol and a rifle, killing his girlfriend, her mother, the mother's husband, the child, and the child's father. Several sanity commissions examined defendant and found him competent to proceed.
Lowenfield was a twenty-eight year old native of Guyana, the son of a carpenter and a nurse. He had the equivalent of a tenth grade education and was trained as a pipe-fitter. He had no history of psychiatric treatment, and professionals examining him in connection with trial found him to be "angry, primitive, paranoid, and narcissistic." His intelligence was estimated in the high average range. The jury found him guilty of three counts of first degree murder and two counts of manslaughter (the infant and the father). Among the supported aggravating circumstances was a finding that he had knowingly created a risk of death or great bodily harm to more than one person. This court affirmed.
In Welcome, the defendant shot and killed his aunt and the aunt's lover in an argument which began over a pocket knife. Soon after the argument started, defendant drew a small caliber pistol and began firing it at the lover. When the lover fled, running around a corner, defendant followed and shot him several more times. Returning to his aunt's home, defendant taunted and threatened her as he reloaded his gun. When she retreated out of her house and down a nearby street, defendant ran her down and shot her several times.
The jury recommended death on both counts, finding as one of the aggravating circumstance that defendant knowingly created the risk of death or great bodily harm to more than one person. This court affirmed.
Comparison of the present case with Koon, Lowenfield and Welcome supports a conclusion that imposition of the death penalty would not be disproportionate, when both the offender and the offense are considered.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) and that Court denies his petition for certiorari; and either, (i) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (ii) that Court denies his petition for rehearing.
NOTES
[*] Kimball, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] Defendant told DeSoto Parish Sheriff Reserve Deputy Jim May on July 15 that he beat his wife because he believed she was sleeping with the three men. He stated that he "was going to kill them all." Later that same day, he made similar comments to Logansport Assistant Chief of Police Michael Davis and added that he would kill his wife and Woodfin the next time he caught them together. During this same week, defendant also told a friend, Kevin Myers, that he "ought to kill the whole mess of them."
[3] On July 21, defendant tried to elicit the help of DeSoto Parish Sheriff's Chief of Detectives Mike Lee to retrieve a boat which his wife and the three men allegedly had taken. When Lee advised defendant to retain counsel because the boat was community property, he retorted that he would "take care of it" himself.
[4] At defendant's request, Kevin Myers went to defendant's home to discuss modification of the shotgun. Myers testified that defendant mentioned that he wanted to shoot a "slug," defined by a pathologist as "big" and "comparable to a Civil War mini-ball" and by a criminalist as "one large lead ball of ammunition."
[5] Merrill explained that an SKS rifle is the Chinese and Russian battle rifle, and that he could distinguish the sound of the discharge of that particular weapon. Aside from his Marine training, he owned several SKS rifles himself. Having fired them numerous times, he could readily recognize the distinct sound. Nearly simultaneously with the discharge of the SKS rifle, Merrill testified that he heard bullets whistling through the air. The second shots came from a shotgun, although Merrill could not testify as to the gauge.
[6] Defendant testified that Woodfin fired directly at him, while advancing and threatening to kill him. When Woodfin had the rifle at the shoulder-ready position and turned to Baggott, the muzzle of the SKS dipped slightly, and defendant lunged inside his car, retrieved the shotgun from its spot on the transmission hump on the front floorboard, cleared the dash, seats, steering wheel, window and door frame, then stepped back and returned fire, shooting from the hip.