720 So.2d 829 (1998)
STATE of Louisiana, Appellee,
v.
Gary Jerome MILLER, Defendant-Appellant.
No. 98-642.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
*830 Don M. Burkett, Many, for State.
Paula C. Marx, Lafayette, Edward K. Bauman, Lake Charles, for Gary Jerome Miller.
Before DOUCET, C.J., and COOKS and SULLIVAN, JJ.
DOUCET, Chief Judge.
On February 13, 1996, the Defendant, Gary Jerome Miller, was indicted by grand jury with the second degree murder of Ruthie Jean Epps, in violation of La.R.S. 14:30.1. At his arraignment, on February 22, 1996, the Defendant entered a plea of not guilty. Jury selection occurred on May 20, 1996. Trial began on May 21, 1996, and on the same day, the Defendant was found guilty as charged, by a unanimous verdict. On August 27, 1996, the trial court sentenced the Defendant to serve life in prison at hard labor, without benefit of probation, parole, or suspension of sentence.
On November 4, 1997, an Application for Out of Time Appeal was filed by Defendant, and was granted by the trial court. In a brief filed on his behalf, the Defendant assigns two assignments of error.

FACTS
On the morning of December 15, 1995, the Defendant shot the victim, Betty Ruth Epps (Ruthie Jean Epps), once in the back of the head. The victim died at the scene. The facts surrounding the shooting will be more fully discussed in our review of the Defendant's *831 first assignment of error related to sufficiency of the evidence.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. A review of the record reveals one error patent.
The grand jury indictment charging the Defendant with second degree murder does not contain a "true bill" indorsement. La. Code Crim.P. art. 383 provides in pertinent part: "An indictment is a written accusation of crime made by a grand jury. It must be concurred in by not less than nine of the grand jurors, indorsed `a true bill,' and the indorsement must be signed by the foreman." Although the present indictment contains the grand jury foreman's signature, it does not contain a "true bill" indorsement. The minutes of the day on which the indictment was filed, February 13, 1996, state the following:
At 10:05 A.M. the jury retired to the jury room for the presentation of cases by the District Attorney.
We have considered 2 cases and returned 2 true bills, 0 no true bills and 0 pretermitted.
 Respectfully submitted,
 s/ Eddie Allen
 FOREMAN, GRAND JURY
 s/ Ronald D. Brandon
 District Attorney/Assistant
 District Attorney
 11th Judicial District
 State of Louisiana
 Parish of Sabine
The following Indictments were filed:
46458 STATE OF LOUISIANA VS GARY JEROME MILLERCHARGE: SECOND DEGREE MURDER by violating the provisions of LSA-R.S. 14:30.1.
Thus, although the indictment itself does not contain the indorsement "a true bill," the minute entry indicates that the indictment was in fact returned as a true bill.
However, we find the Defendant is prevented from raising this error due to his failure to file a motion to quash. La.Code Crim.P. art. 533 provides for the quashing of an indictment if it was not indorsed "a true bill," or the endorsement was not signed by the foreman of the grand jury. According to La.Code Crim.P. art. 535(C), a motion to quash on such grounds must be filed in accordance with La.Code Crim.P. art. 521i.e., within 15 days of arraignment, unless a longer period is fixed by the court. Thus, even though the lack of a "true bill" indorsement is an error patent, the error is waived due to the Defendant's failure to file a motion to quash before trial.

ASSIGNMENT OF ERROR NO. 1
By this assignment, the Defendant contends the evidence adduced at trial was insufficient to sustain a verdict of guilty as charged.
Second degree murder is defined by La. R.S. 14:30.1, in pertinent part, as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
....
The Defendant does not deny shooting the victim on the day in question. Rather, the Defendant argues that the State failed to prove that the killing was not in self defense, or alternatively, that it was not committed in heat of blood, such that the Defendant should have been convicted of manslaughter. The first issue which will be taken up is self-defense.
Under Louisiana law, the fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La.R.S. 14:18. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20(1).
When a defendant in a homicide prosecution asserts that he acted in self defense, he does not have any burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt *832 that the homicide was not committed in self defense. State v. Hall, 91-1296 (La.App. 3 Cir. 10/6/92); 606 So.2d 972; State v. Patterson, 295 So.2d 792 (La.1974); State v. Carrier, 95-1003 (La.App. 3 Cir. 3/6/96); 670 So.2d 794, writ denied, 96-0881 (La.9/20/96); 679 So.2d 431; State v. Makar, 578 So.2d 564 (La.App. 3 Cir.1991). This court has characterized this burden of proof as a heavy one in which the state must "exclude every reasonable hypothesis of justification by self-defense." Makar, 578 So.2d at 569. When a defendant claims, on appeal, that the state failed to prove a homicide was not committed in self-defense, the standard of review is that of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the homicide was not committed in self-defense. Makar, 578 So.2d 564.
The Defendant relies on several facts to support his contention that the shooting was in self-defense. The Defendant, Gary Jerome Miller, and the victim, Betty Ruth Epps, had a relationship for approximately eleven years prior to the shooting. However, they were not married. Prior to the shooting, there had been several abusive incidents between the two. The Defendant, Gary Miller, was arrested on October 19, 1992, for aggravated battery of Ms. Epps. On many other occasions, the victim, Ms. Epps, had abused the Defendant by shooting, beating, or stabbing him.
The police department was aware of this ongoing abusive situation. Jack Staton, an officer with the Sabine Parish Sheriff's Department, testified that he was aware of the abuse between Defendant and Ms. Epps, and knew of at least one incident where the Defendant received a wound. In addition, Marvin Frazier, an officer with the Zwolle Police Department, testified that he had responded to several abuse calls at the Epps' residence, involving both the Defendant and Ms. Epps. Also, he testified that he had seen signs of physical abuse, with guns and knives, on both the Defendant and Ms. Epps, on several occasions.
In addition to the police department's involvement, friends and family knew the couple fought on a regular basis. Ms. Epps' next door neighbor, Donna Aldridge, testified that the couple argued often, and that Ms. Epps hit, cut and shot the Defendant, and that Ms. Epps was shot one time by the Defendant. Also, according to Betty Hunt, Ms. Epps' ex-sister-in-law, there were incidents of abuse and violent behavior between the two. Ms. Hunt stated that she had seen one such incident the night before the shooting. Finally, Bessie Brown, the Defendant's mother, testified that she knew the two argued frequently, and was present one time when Ms. Epps brought a gun to Ms. Brown's home, threatening the Defendant.
During the evening of December 14, 1995, the night before the shooting, the Defendant and Ms. Epps, along with several other people, had gone to the D.A.V. Hall to play bingo, a regular activity for the group. During this particular bingo trip, the victim and Defendant began arguing about money. The Defendant testified that the argument was because Ms. Epps refused to buy the Defendant a bingo card when he asked, and cursed at him for asking. The argument soon escalated, and the two went outside to continue the argument and to avoid a scene. However, according to Betty Hunt, the couple came back into the hall shortly thereafter. Finally that evening, the Defendant and Ms. Epps left the bingo hall, the Defendant attempted to get his paycheck from his boss, who was not at home, and he then went back to Ms. Epps' house, leaving about 12:30 a.m.
At approximately 5:00 a.m. on December 15, 1995, the Defendant returned to Ms. Epps' house, because his ride to work was to pick him up there. The Defendant testified that he told Ms. Epps that he could not get any money that morning, but that he would get it for her by the evening. Further, the Defendant said that Ms. Epps was not satisfied with this answer and began cursing the Defendant.
Thereafter, Defendant related that he asked Ms. Epps for lunch money and she cursed at him. He walked out onto the porch, she passed him by, cursing, and went into her purse, for what the Defendant says *833 he thought was money. Instead, she came out with a gun, and cocked it. The Defendant said he became scared and began to wrestle the gun away, backed up, and the gun went off. After he shot her, according to the Defendant, he took off running, and did not look back to see if Ms. Epps had fallen or whether she was dead. In support of the Defendant's claim, Officer Michael Hagar testified that although the Defendant did not say anything about a struggle or a fight, he did state that Ms. Epps pulled the gun out of her purse. Deputy Jack Staton arrested the Defendant, took him to City Hall, and read him his rights. Thereafter, Defendant signed a waiver of rights form. While being interviewed the Defendant said that Ms. Epps had the gun, and that he took it from her.
In contrast to the version of events related by the Defendant, the State presented two eyewitnesses, Ms. Epps' son, Thomas T. Epps (Terrell), who actually saw the Defendant shoot his mother, and Donna Aldridge, a next door neighbor, who saw the Defendant run off after she heard the shot.
Terrell testified that his mother woke him up the morning of the shooting and the Defendant was sitting in the living room when he got up. Furthermore, Terrell said after his mother got her purse and keys to go to the store, she walked out the front door, the Defendant followed, and Terrell followed him. Terrell further testified that the Defendant pulled a gun out of his pants and shot Ms. Epps in the back of the head, while she was facing the car door. Terrell said that the Defendant ran away after he shot Ms. Epps. However, on cross examination of Terrell, the defense pointed out that since the Defendant's back was to Terrell, he could not see whether the Defendant pulled the gun out of his pants.
Another witness, Donna Aldridge, Ms. Epps' neighbor, testified that she heard a shot, immediately went to her door, and saw the Defendant stand there for a while, and then run off. Ms. Aldridge testified that she then went over to the Epps house and saw Ms. Epps lying on the sidewalk, dead.
In the Defendant's own recorded statement, after he was taken into custody, he said that he shot her after they had been arguing about money and after he had gotten the gun from her. He said that he had possession of the gun when he shot her, was approximately three and one-half feet away from her, and that she was facing him when he pointed the gun at her, but turned away to say something when he pulled the trigger. He then said he took off running after the shooting and never looked back.
The State called retired Deputy James McComic, who spoke with the Defendant at City Hall during the Defendant's recorded interview. He testified that the Defendant I said that he, and not Ms. Epps, had the gun at the time of the shooting. Additionally, Deputy McComic testified that the Defendant said that Ms. Epps was walking away from the Defendant at the time of the shooting, and that there was no struggle over the gun, only an argument over money.
Also, Officer Michael Hagar testified that the Defendant, upon initial questioning at City Hall, said that he got the gun out of Ms. Epps' purse and shot her. However, at the recorded interview, taken in Officer Hagar's presence, the Defendant said that he took the gun away from her in a struggle, but at the time of the shooting, he had possession of the gun. Additionally, the Defendant said that Ms. Epps was walking away from him when he shot her.
According to the coroner, Dr. George McCormick, the cause of death was a gunshot wound to the head. The wound placement was consistent with someone following Ms. Epps and shooting her from behind. However, on cross-examination, the coroner admitted that the wound may also have been caused by someone turning away as the gun went off.
The record indicates the victim and the Defendant had an abusive relationship. The Defendant testified that on the morning of the shooting, he and Ms. Epps had been arguing. Further, the Defendant testified that he wrestled the gun away from Ms. Epps after she pulled it on him. However, testimony (including that of the Defendant at the recorded interview) establishes that the gun did not go off during the struggle over *834 the gun, but that the Defendant had possession of the gun, and shot Ms. Epps in the back of the head, while her back was to him. Furthermore, the eyewitness' testimony indicates that the Defendant stood over Ms. Epps for a while before he ran, a direct contradiction to the Defendant's own testimony that he took off running immediately after he shot her, and did not know she was dead until Jack Staton told him.
In sum, we find the evidence supports the conclusion that the Defendant did not act in self-defense. Therefore, this issue lacks merit.
In the alternative, the Defendant argues that the evidence did not support a conviction for second degree murder, since the shooting occurred during an argument. He argues that, at most, the evidence may have been sufficient to support manslaughter. Manslaughter is defined in La.R.S. 14:31 as:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

. . . . .
The presence of "sudden passion" or "heat of blood" makes manslaughter a different crime than murder. The supreme court in State v. Baldwin, 96-1660 (La.12/12/97); 705 So.2d 1076, held that manslaughter exists if a defendant can prove mitigating factors such as provocation, by a preponderance of the evidence. Id. Most notably, "provocation shall not reduce the homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled ..." La.R.S. 14:31 A(1).
Here, the jurors reasonably could have concluded that there was no imminent provocation. The Defendant's own statement at City Hall shows that he had possession of the gun, and that the gun did not "go off" as the couple was arguing. The Defendant's own testimony is inconsistent with the "heat of blood" homicide. He said that he killed Ms. Epps in self-defense, not in the heat of blood. The only thing the Defendant can rely on is the fact that he and Ms. Epps were arguing at the time, and the fact that she had previously threatened him with a gun. However, the Defendant's own statement at City Hall was that he had the gun at the time of the shooting, thus, there was no danger that Ms. Epps could have shot him.
"Heat of blood" or "sudden passion" is defined in the case law as a homicide committed by such provocation sufficient to deprive an average person of his self-control and cool reflection. However, the fact finder will not be able to find manslaughter if he finds that the offender's blood would have cooled at the time the offense was committed. State v. Bourque, 636 So.2d 254 (La. App. 3 Cir.1994); writ denied, 94-1839 (La.1/6/95); 648 So.2d 920; State v. Price, 635 So.2d 1298 (La.App. 4 Cir.1994), writ denied, 94-1288 (La.9/23/94); 642 So.2d 1310.
In the case at bar, because the victim did not have control of the gun at the time of the shooting, there was no fear of being harmed by Ms. Epps. The Defendant's only provocation would have been that they were arguing. Louisiana law says that even when the victim curses at the offender and an argument ensues, this alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter. See State v. Gauthier, 546 So.2d 652 (La.App. 4 Cir.1989).
By the Defendant's own statement, Ms. Epps did not have the gun, and therefore, the Defendant was not in any imminent threat of harm. Thus, this assignment likewise lacks merit.

ASSIGNMENT OF ERROR NO. 2
In Defendant's second assignment of error he states that the trial court erred when it failed to admonish the jury per defense counsel's request. This assignment of error relates to the testimony of Jack Staton, which *835 admittedly, was damaging to the defense's case.
In the case at bar, Deputy Staton testified that the Defendant had spoken with him on the ride to City Hall for booking, and said that he (the Defendant) went up behind Ms. Epps and shot her in the head. After Dr. McCormick's testimony, and after the State had rested its case, the defense objected and asked for a mistrial or admonition, based on the State's failure to give notice of Staton's testimony.
We note that Defendant's failure to raise the prejudicial remark in a timely manner was a violation of the contemporaneous objection rule. Under Louisiana law, an objection to prejudicial remarks must be contemporaneously made. State v. Thomas, 325 So.2d 593 (La.1976). Consequently, if the objection to the improper remark is not raised by the defendant in a contemporaneous objection, the defendant is deemed to have waived it. State v. Williams, 383 So.2d 996 (La.1979). Because the Defendant did not raise the objection to Staton's testimony until after the State rested, we find the Defendant waived the objection.
Accordingly, for the reasons stated above, Defendant's conviction is affirmed.
AFFIRMED.