578 So.2d 564 (1991)
STATE of Louisiana, Plaintiff-Appellee,
v.
John MAKAR, Defendant-Appellant.
No. Cr90-814.
Court of Appeal of Louisiana, Third Circuit.
April 17, 1991.
*565 J. Michael Small, Timothy Meche, Alexandria, for defendant-appellant.
Michael Henry, Dist. Atty., Natchitoches, for plaintiff-appellee.
Before GUIDRY, FORET and YELVERTON, JJ.
YELVERTON, Judge.
Defendant, John Makar, 78 years of age, was convicted of second degree murder, a violation of La.R.S. 14:30.1, following a bench trial. He was given the mandatory sentence for that crime of life imprisonment without benefit of parole, probation or suspension of sentence. He now appeals his conviction to this court, urging fifteen assignments of error. Two of those, Nos. 14 and 15, have to do with the sufficiency of the evidence for a conviction. We find that the evidence fails to prove beyond a reasonable doubt that Makar did not act in self-defense. For this reason we reverse the conviction, and we order a judgment of acquittal.

FACTS
On October 18, 1989, Makar shot and killed John Johnson III. The facts and circumstances leading up to the shooting are detailed in the record.
In 1946, Makar began the practice of law in Natchitoches, Louisiana. He was a full time and successful lawyer until 1974, when he chose to semi-retire at the age of sixty-two. After that he limited his practice and looked after his business interests.
Defendant first met John Johnson in 1969 after Johnson had been convicted of drug charges in Shreveport, Louisiana. Defendant succeeded in getting Johnson admitted to a drug treatment center in lieu of serving a five year prison sentence. Johnson later violated the conditions of his probation by leaving the drug treatment center and had to serve the five year sentence at the Louisiana penitentiary.
Defendant did not have any further significant contact with Johnson until 1986, when the two men met in District Court in Winnfield. Johnson had been charged with abusing an elderly person, a charge which was eventually dismissed. Johnson at that time owned two failing businesses in Winnfield, a hotel and a dry cleaners, and he approached Makar about obtaining financial assistance. Makar helped him by purchasing a judgment against the hotel and assuming the mortgage on the dry cleaners. Defendant eventually became full owner of both businesses. This was the beginning of a series of business involvements between the two men which continued until the day of the shooting.
Following this, Makar began to have increased contact with Johnson, loaning him money, allowing him to live rent free in one of his apartments, and lending him a vehicle for several months. Makar also represented Johnson on an aggravated assault charge. Makar testified that Johnson became dependent upon him for money and other services.
Makar's testimony reveals that it was not long before Johnson was demanding favors. He recounted several incidents at trial in which Johnson mentally and physically abused him.
The first of these incidents occurred in November of 1988. Makar testified that he had allowed a man named Calvin Pustejovsky to live in one of his apartments. When Johnson learned of this, he became furious and demanded that Makar force Pustejovsky to move out. Apparently Johnson blamed Pustejovsky for "squealing" on him and causing him to serve time in jail on an aggravated assault charge. Johnson came to Makar's office several times and threatened *566 him with bodily harm unless he got rid of Pustejovsky. Makar delayed. Finally, Johnson came to Makar's office armed with an axe handle. He banged it on his typewriter and jabbed Makar in the chest repeatedly, again demanding that Makar force Pustejovsky to move out. At this point defendant agreed to ride with Johnson to the apartment where Pustejovsky was living. While en route to the apartment in Johnson's truck, Makar saw a loaded gun on the seat between him and Johnson. The two men went to the apartment, where Makar reluctantly informed Pustejovsky that he had to move out.
Makar was an old man, in his mid-seventies, when these events were going on, and he weighed 140 pounds. Johnson was 30 years Makar's junior, and he weighed 240-250 pounds.
Following the incident with the axe handle, Makar went to see Natchitoches Chief of Police Burl Lee. He sat down and explained to Lee generally about Johnson's conduct, and specifically recounted the axe handle incident. Lee testified at the trial. When told by Makar that he feared for his personal safety, Lee informed him that he had the right to protect himself.
Makar recounted several other incidents at trial. In 1989, Disney Productions entered into a contract with him for the use of the Winnfield hotel, which he then owned, for the filming of the movie "Blaze". One day during the filming Johnson apparently became upset with Makar, threatening him and poking him in the chest with his fingers. Several members of the Louisiana Film Commission witnessed this incident, including Winnfield business man George Harrell. Harrell testified that Johnson was intimidating Makar.
Makar further told of an incident in which Johnson attempted to run over him with a truck after he refused to provide Johnson with money for gasoline. Kelvin Durr, a local fireman, witnessed this incident. Durr testified that Makar had to jump out of the way to avoid being hit by the truck.
The majority of incidents in which Johnson abused Makar occurred inside his office, outside the presence of witnesses. Makar testified that Johnson would come to his office, look around to make sure no one was there and then lock the door. He would then demand money and threaten him if he did not comply. Makar told of an occasion when Johnson, standing opposite his desk, picked up the desk and dumped his papers and files on top of him. He told of another incident in which Johnson pushed and shoved him down the hallway of his office, forcing him to leave his office and run down the street to his wife's antique shop. Makar stated that he stayed at his wife's shop for quite some time, because he was afraid.
There was testimony at trial that Makar's reaction to these events began to show. Benny Patterson, a friend, testified that Makar came to his house three times a week, "scared to death" after confrontations with Johnson. Louis Hyams, Makar's neighbor, testified that he could see that Makar was concerned and scared of being hurt.
Makar maintained in his statement and throughout the trial that the reason he never filed criminal charges against Johnson was his fear that Johnson would then surely hurt him, or kill him. He stated that he continued to support Johnson out of compassion, and in the hope that he would straighten out. He said that once in a while Johnson, after an encounter, would come in and apologize.
A number of times Makar tried to convince Johnson to seek psychiatric help. Makar wrote him letters, appealing to him to stop his abusive behavior. The abuse continued, however, according to Makar, to the point where he began to think about protecting himself. After a discussion with Louis Hyams, Makar borrowed a .38 caliber pistol from Hyams and placed the pistol in a desk drawer in his office. This occurred in September of 1989. Defendant testified that he did not bring the gun home because he never had a firearm and believed it was dangerous to keep firearms around the house.
*567 One of Makar's last confrontations with Johnson before the shooting occurred on October 2, 1989. Johnson came to Makar's office and demanded that he allow a friend of his, Delores Austin, to live in Makar's apartments rent free. When Makar refused, Johnson became extremely angry, went behind Makar's desk, grabbed him by the hair, poked him in the eyes with his fingers and otherwise threatened him with bodily harm. Makar testified that he then reluctantly agreed to allow the woman to live in an apartment rent free.
On October 18, 1989, Makar was at his office when he heard someone knocking on a window. He saw that Johnson was motioning for him to open the office door. He unlocked the door and let Johnson in, noticing that Johnson locked the door after walking into the office. Johnson sat quietly in front of Makar's desk for a while and then began complaining to him that he needed money to get some jewelry out of hock, and for food. He also complained about various lawsuits which Makar was handling for him, including a claim against Disney Productions for property loss and damage during the filming of the movie "Blaze". Makar related that when he tried to explain to Johnson that he could not loan him any more money, Johnson got mad and began cursing. At some point Johnson went down the hall in Makar's office to a refrigerator to get a soft drink. When he came back with the soft drink, he was carrying a three foot long wooden stake used to support real estate signs. Makar had a supply of these stakes in the room where the refrigerator was located. The deceased set the stake and the soft drink down on Makar's desk and poured some of the drink into a glass, so that defendant could share the drink with him. Makar hoped that Johnson would calm down. He resumed his demands for money, however, and became more aggressive and angrier. Makar testified that Johnson then picked up the stake and knocked a paper tray off of his desk. He then raised the stake as though to strike defendant. Makar, who by then had his hand on the gun in his drawer, drew the weapon and fired once, striking Johnson in the left temple. The wound proved fatal.
Makar could not remember how long he sat at his desk after the shooting. It was a few minutes, as he tried to calm down, and get control of himself. He then called the police.
In a statement given to the police about an hour after the shooting, Makar narrated the event in detail. He stated that when he drew his weapon he said "I've had enough". He further stated that Johnson "sputtered and spun around" after he drew the weapon. Makar admitted at trial that Johnson never touched him with the stake.
On October 22, 1989, four days after the shooting, three sisters who were close friends of Johnson met in Natchitoches to attend the funeral. They went to Johnson's apartment and talked to Oscar Vails, an old man for whom Johnson had cared. While they were there, Makar arrived. The women testified that they questioned him, and that Makar said he should have shot Johnson a year ago and that he was tired of Johnson's "stuff". The women also testified that Makar told them that when Johnson saw his gun, he shouted "oh, no" or "oh, my God", threw up his hands and turned to run, and that that was when he shot him.
Lieutenant Keith Thompson of the City of Natchitoches testified that when he arrived in Makar's office, papers were spread on the floor near Johnson's body. Blood spatters were on these papers, but on the side which faced the floor. Thompson gave his opinion that this was inconsistent with Makar's statement that Johnson raked the papers off of the desk before being shot. At the trial, Makar testified that he could not remember the sequence of the shooting, Johnson's raising of the stake and paper falling to the floorall seemed to have occurred at once.
On this appeal, of the fifteen assignments of error, six were abandoned, three have no merit, and six have merit. We find merit in assignment numbers eight, nine, ten, eleven, fourteen and fifteen. In this opinion we find it unnecessary to discuss any assignments except the last two, dealing *568 with the sufficiency of the evidence to convict. We limit our discussion to these two assignments because, based on our careful study and review of this record and the evidence, we find that there exists a reasonable hypothesis that Makar acted in self-defense.

SELF-DEFENSE
Makar has admitted from the start that he shot and killed Johnson. The evidence leaves no doubt that he had the specific intent to kill Johnson or inflict great bodily harm on him when he drew the gun and fired. These elements of second degree murder, La.R.S. 14:30.1, are thus present. Makar claimed, however, that the act was done in self-defense.
Under our law the fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La.R.S. 14:18. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20(1).
When a defendant in a homicide prosecution asserts that he acted in self-defense, he does not have any burden of proof on that issue. The state bears the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Patterson, 295 So.2d 792 (La.1974).
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982).
Since there were no witnesses to the shooting, the state relied on circumstantial evidence in order to show that defendant did not shoot Johnson in self-defense. Where an essential element of a crime is sought to be proven by circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. Because Makar relied on self-defense, that it was not done in self-defense became an essential element of the crime sought to be proved.
The evidence relied on by the state as proof that the killing was not done in self-defense consists largely of the observations and opinions of Police Lieutenant Keith Thompson. First, Thompson found small spots of blood on the undersides of some papers on the floor. This was offered as being inconsistent with Makar's testimony that the deceased raked the papers off the desk before being shot.
An inconsistency with his testimony is a reasonable explanation; but it is not the only reasonable explanation. As reasonable, is that the papers were on the edge of the desk and fell to the floor at the time of the shooting, or when Makar walked by later to open the door, or when the door was opened and a draft created.
Second, Thompson believed, based on the presence of blood and meaty tissue on the filing cabinets in Makar's office, that Johnson's body had been turned over after the shooting. For what purpose this might have occurred is not entirely clear. We think it improbable, however, that this diminutive 77 year old man could have physically accomplished the feat of repositioning the deceased, who weighed 240-250 pounds. The body could have moved during its death throes. Makar testified that Johnson fell where he was shot. The stake was found near the body.
Finally, the lieutenant's opinion of the location of the wound, reinforced by the testimony of the three sisters about what Makar told them, was offered to show that Johnson was trying to run away when he was shot. However, the bullet wound and path in Johnson's skull is consistent with the scenario described by Makar: the coroner's report shows that the bullet entered *569 Johnson's left temple and was removed from the right rear of the head.
When all of the evidence presented by the state for the purpose of excluding every reasonable hypothesis that Makar did not shoot in self-defense, is examined in the light most favorable to the prosecution, it is legally insufficient to meet the state's heavy burden of proof.
Johnson had an extensive history of abusive behavior toward Makar. Although this behavior consisted mainly of threats and intimidation, the abuse rose to the physical level on several occasions. In the past, Johnson had pushed Makar down the hallway of his office, poked him in the chest with an axe handle, grabbed him by the hair and poked him in the eyes and chest with his fingers. Johnson weighed between 240 and 250 pounds and was 30 years younger than Makar. Defendant weighs 140 pounds. There was testimony at trial that Johnson had a bad reputation in the community. Johnson also had a lengthy criminal record which was introduced at trial. This record included assault charges and various other felonies. All of these factors support the conclusion that defendant's fear for his personal safety was reasonable.
Johnson arrived at Makar's office unarmed. Defendant unlocked the door and let him into the office. Johnson began complaining that he needed money for various reasons. He went to the back of the office to get a soft drink and when he returned he was carrying a large wooden stake. Johnson's anger increased when Makar refused to provide him with money. He used the stake to knock a paper tray off defendant's desk and then raised the stake as though to strike defendant. At this point we can understand defendant's belief that use of the gun was necessary. His growing fear of Johnson, sustained by months of threats and near-violence, caused him then to reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm. He knew that one blow by the stake on his head could kill him. He was cornered, seated, and had nowhere to run. A warning might only have enraged Johnson. His belief that killing Johnson was necessary to save himself from the danger was reasonable in light of the circumstances.
Under our burden of proof principles applicable to criminal cases, the state has failed to prove circumstances that exclude every reasonable hypothesis of justification by self-defense. That was the state's burden of proof, not the defendant's.
For the foregoing reasons, the conviction is reversed and set aside. A judgment of acquittal is ordered. The case is remanded, and the trial court is ordered to grant a judgment of acquittal, and release the defendant from custody.
CONVICTION REVERSED; JUDGMENT OF ACQUITTAL ORDERED.