# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-788

STATE OF LOUISIANA

VERSUS

MICHAEL ALEXANDER

************

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT,
PARISH OF ALLEN, NO. 2001-5496,
HONORABLE JOHN P. NAVARRE, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and John B. Scofield,[*] Judges.

**REVERSED; ACQUITTAL ORDERED.**

**Douglas L. Hebert, Jr.**
**District Attorney**
**John Erwin Demoruelle**
**Assistant District Attorney**
**Post Office Drawer 839**
**Oberlin, Louisiana 70655**
**(337) 639-2641**
**Counsel for State of Louisiana**

**James Michael Small**
**Attorney at Law**
**Post Office Box 1470**
**Alexandria, Louisiana 71309**
**(318) 487-8963**
**Counsel for Defendant/Appellant:**
        **Michael Alexander**

---

[*]John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge *Pro Tempore.*

SULLIVAN, Judge.

On April 18, 2001, at 6:30 a.m., Michael Alexander shot and killed Frederick Victorian. He was charged with manslaughter in violation of La.R.S. 14:31(A)(1). Following a bench trial, Mr. Alexander was convicted of negligent homicide, a responsive verdict for manslaughter. La.R.S. 14:32. He was sentenced to five years at hard labor, suspended, three years supervised probation, a fine of two thousand five hundred dollars, and one thousand hours of community service.

For the following reasons, we reverse the conviction.

### *Discussion*

Defendant admits shooting Mr. Victorian but asserts that he did so in self-defense. He urges that the evidence was insufficient to support his conviction. Louisiana Revised Statute 14:20 provides that a homicide is justifiable:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and must determine "whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). When a defendant claims that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that he did *not* act in self-defense. *State v. Brown*, 414 So.2d 726 (La.1982). Defendant argues that the State failed to carry its burden of proof on this issue. Therefore, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found beyond a reasonable doubt that he did *not* act in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

Sadly, the scenario surrounding Mr. Victorian's death is not uncommon: a jealous husband (Mr. Victorian) seeks out his wife (Donna Coleman) and the new man in her life (Defendant), and tragedy results. Mr. Victorian and Donna Coleman were married on May 17, 1996; they had two children. Ms. Coleman separated from Mr. Victorian in September 2000; she filed for divorce on March 9, 2001. At Defendant's trial, Ms. Coleman described herself as a victim of domestic violence. She testified that Mr. Victorian often accused her of having affairs with other men and that he had physically and mentally abused her. She gave specific examples of his abuse: putting guns to her head and knives to her throat; smashing her face into a car window for talking to a pharmacist at a T-ball game; and beating her and accusing her of having sex with a doctor after she received a free sample of medicine for their son.

Ms. Coleman filed complaints against Mr. Victorian with the Oakdale Police Department on October 25, 2000, and November 25, 2000. The October 25, 2000 complaint alleged that they had gotten into an argument because she went to a banquet, and he accused her of sitting next to a white man. The complaint also stated that he had hit her in the face and gone to her place of employment looking for her administrator. The November 25, 2000 complaint was that Mr. Victorian was following her and that she was scared of him. When she filed for divorce, Ms. Coleman obtained a restraining order against him. Mr. Victorian filed a complaint against Ms. Coleman on December 26, 2000, in which he alleged that she had stolen his .380 caliber handgun.

Ms. Coleman is a licensed practical nurse and worked at Oakdale Community Hospital when she separated from Mr. Victorian. She testified that she left her job at the hospital in March 2001 and began working full time for Defendant because she felt the hospital had become unsafe for her, explaining that Mr. Victorian had threatened her at work. Defendant is a registered nurse anesthetist and owns Oakdale Anesthesia, Inc. He knew Ms. Coleman from her employment at the hospital and hired her to do billing for his business. Ms. Coleman testified that when she began working for Defendant she worked the same hours Mr. Victorian worked, 10:00 p.m. until 6:00 a.m., in an attempt to make herself "invisible" to him. She and Defendant admitted that they had "sexual encounters" after she began working for him in December 2000 but denied having an affair. Ms. Coleman testified that Mr. Victorian had threatened her life on many occasions and had threatened to kill Defendant from January 2001 until the day of the shooting.

Defendant testified that Ms. Coleman told him about Mr. Victorian's threats against him. He also testified that he knew Mr. Victorian had physically attacked Ms. Coleman and that she had obtained a restraining order against him. He testified that he was fearful of Mr. Victorian because of his threats. He admitted that he purchased a .40 caliber handgun on October 27, 2000, but denied purchasing the gun because of Mr. Victorian, explaining that he purchased the gun for personal protection because he often carries a deposit bag to the bank for his business. Ammunition for the .40 caliber gun and for a .452 magnum were found in Defendant's vehicle after the shooting. Defendant testified that he used the ammunition for target practice. Defendant has another gun registered in his name, but it was not in his vehicle during these events.

The night before the shooting, Ms. Coleman worked for Defendant. Defendant testified that he also worked that night and left the hospital at 11:00 p.m. and went to the "call room" for the hospital, which is in the same building as the office in which Ms. Coleman did billing for his office. Defendant further related that, at approximately 6:20 the next morning, he set out to drive Ms. Coleman to her home and that he was then going to the hospital.

As they drove toward her home, Ms. Coleman noticed Mr. Victorian following them and told Defendant. She testified that she was very terrified and believed that Mr. Victorian would carry out his threats to kill her and Defendant and that she relayed her fears to Defendant. She testified that Defendant turned into the hospital parking lot to confirm that Mr. Victorian was following them. They both testified that they hoped Mr. Victorian would drive on. Instead, he followed them into the parking lot, got out of his car, and stood talking and gesturing toward them, but they could not hear what he said.

Shirley Miles, an employee at the hospital, testified that when she arrived for work that morning at about 6:30, she pulled into the front parking lot behind a Suburban (Defendant's vehicle); an old blue car (Mr. Victorian's vehicle) pulled in behind her. When she got out of her car, she noticed the driver of the blue car standing outside his car. Ms. Miles testified that she heard the man say, "Don't run you MF," then the Suburban drove off and the blue car followed it toward town.

Ms. Coleman testified that she told Defendant there was no reason Mr. Victorian should be following them and that she had a restraining order against him. She asked him to take her to the police station because she felt Mr. Victorian needed to be disciplined for violating the restraining order. According to

4

Ms. Coleman, Defendant drove toward the police station as fast as he safely could. On the way, they saw a police car coming toward them. Defendant blew his horn and rolled down his window in an attempt to flag down the officer; however, the officer did not stop. Ms. Coleman admitted that Defendant had a cell phone with him, but they did not think to use it to call for help.

Ms. Coleman further testified that when they arrived at the police station, she jumped out of the Suburban before it came to a stop and ran into the police station. She testified that she looked back as she ran and saw Mr. Victorian's car parked right behind Defendant's Suburban. She also testified that she saw Mr. Victorian holding a long object that appeared to be the barrel of a shotgun and that she believed she would be shot as she ran into the station. She yelled for help, as she entered the police station, stating she had a restraining order against her husband and that he was chasing them. She then heard gunshots outside. She estimated that it took her four to five seconds to run inside before she heard the gunshots. Ms. Coleman testified that she thought Defendant had been shot and killed, explaining that she knew her husband owned a gun and believed that he had carried out his threats to kill Defendant.

Defendant does not have a criminal record. He testified that he was terrified because of Mr. Victorian's threats against him and that he drove as quickly as he could toward the police station. He admitted that he did not use his cell phone to call for help, explaining that he was concerned with getting to the police station. On the way to the station, Defendant saw a police officer driving toward him. He tried to lower his electric window and flag the officer down and that he got his hand partially through the opening in the window, but the officer waved and continued driving. He

5

testified that he hoped to have the officer prevent Mr. Victorian from getting out of his car with a weapon and that, if he had planned to harm Mr. Victorian, he would not have tried to flag down an officer.

Officer Virgil West testified that he was on patrol that morning when he saw a gray Suburban at 6:30 on Seventh Street and a blue Oldsmobile Cutlass following it. He testified that he did not notice anything out of the ordinary about the two vehicles. He heard the Suburban's horn blow and saw a hand wave. He waved back, believing it was someone he knew who had a similar vehicle. He could not see inside the vehicle, but remembered seeing a hand inside the window; he did not recall seeing a hand outside the Suburban window.

Within a few seconds of passing Officer West, Defendant arrived at the police station. He testified that Ms. Coleman jumped out of the Suburban, as he was applying his brakes to park, and ran into the police station. He next testified that, as he parked, he reached over and closed the passenger's door, which had not closed when Ms. Coleman exited. Defendant further testified that he saw Mr. Victorian's car behind him when he was about to get out of his Suburban. He then saw Mr. Victorian coming at him with a weapon, which he thought was a shotgun. He testified that he was very scared and nervous and got out of the Suburban with his .40 caliber gun in his hand, intending to run into the police station; however, Mr. Victorian charged at him. He explained that he did not stay in his Suburban because he felt he could be shot through the door. Once out of his Suburban, Defendant testified that he was at the end of his door but unable to get around the door because Mr. Victorian was "right up on" him. At that point, Mr. Victorian was "face to face" with Defendant and made a swinging motion with the weapon in his

hand. Defendant explained that he backed into the doorway of the Suburban then stopped, turned, and fired in a split second because Mr. Victorian continued toward him. He did not know that Mr. Victorian had been hit because he continued advancing toward him, and he shot two more times. Defendant knew then that Mr. Victorian had been hit because he stopped and stood in front of him. He pushed Mr. Victorian to the side and went around him to go into the police station. As he walked to the police station door, Defendant saw Mr. Victorian fall to the ground and the stick fall and roll away from him. Defendant testified that throughout these events he was afraid for his life.

Oakdale Police Officer Laticia Alidia Reese testified that she was working at the police station when the shooting occurred. She testified that around 6:30 a.m. Ms. Coleman entered the front door of the police station, hurried through the waiting room, and approached her at the dispatcher's office. She described Ms. Coleman as very excited, panicky, and hysterical. She testified that Ms. Coleman stated: "There's a man outside that we have a restraining order against." Officer Reese testified that two seconds later she heard three gunshots fired in rapid succession. In her incident report prepared the day of the shooting, Officer Reese stated that she heard gunshots immediately after Ms. Coleman stated there was a man outside. Officer Reese testified that Defendant told them, "He was chasing me with a stick. He was coming at me with a stick."

Oakdale Police Officer Laura "Penny" Kirklin was also at the station the morning of the shooting. She testified that she heard the gunshots from her office and described the cadence of shots as "pow, pow, pow." She left her office and went to the lobby where she saw Defendant and Ms. Coleman. She described Ms. Coleman

7

as screaming, hollering, and crying. She testified that she believed Ms. Coleman was really afraid. Officer Kirklin also spoke with Defendant and described him as nervous or upset.

Oakdale Police dispatcher Charlene Vickers Hutchins testified that she heard "what appeared to be tire squealing like someone slamming on the brakes" and loud voices outside the station shortly before the shooting. Defendant testified that he believed the sound described by Officer Hutchins was Mr. Victorian jamming his car into "Park" as he pulled into the parking lot, which may explain Mr. Victorian's speed in exiting his vehicle and charging Defendant. Officer Hutchins further testified that, after she heard the gunshots, she opened the door of the police station and saw a black man within a foot or two of the door with a gun in his hand. He was pointing the gun and looking toward the parking lot. She told him to give her the gun; he said "he's got a pipe" or "he was after me with a pipe." She again told him to give her the gun, and he did. Officer Hutchins described Defendant as nervous, scared, and trying to get away from Mr. Victorian.

The evidence established that Mr. Victorian parked his car at an angle behind Defendant's Suburban such that it would have been impossible for Defendant to back out of his parking space and that he was within two or three feet of Defendant when he was shot. Officer Reese testified that the driver's door of the Suburban was open and that Mr. Victorian was lying on his stomach diagonally between the open door and the interior of the Suburban, about one foot from the Suburban. She testified that a long wooden stick with gray tape on it was on the ground about two feet from the Suburban's driver's side rear tire. The stick was parallel to Mr. Victorian's body, about two to three feet from him. According to Officer Reese, Mr. Victorian was still

8

breathing when the ambulance arrived and took him to the hospital. Officer Kirklin testified that Mr. Victorian was three to four feet from the driver's side of the Suburban and that the position of the stick was consistent with where she would expect it to be if Mr. Victorian was holding it when he fell. Officer Hutchins testified that she saw Mr. Victorian laying with his head under the open Suburban door. She smelled a very strong odor of alcohol coming from him and from his car. She saw a stick laying against the rear driver-side tire, partially underneath the Suburban, which looked like it rolled there when Mr. Victorian dropped it and fell to the ground.

When Officer West arrived at the scene, he saw Mr. Victorian lying three or four feet from the side of the Suburban. He saw the stick right in front of the rear tire in a position that was consistent with it having fallen from Mr. Victorian's hand when he fell to the ground. He also testified that Mr. Victorian's vehicle smelled like alcohol and that there was a beer bottle in the front console. He placed Defendant under arrest.

Lieutenant Charles Powers testified that he arrived after the shooting, and Mr. Victorian had already been taken to the hospital. He collected the evidence at the scene, which included Defendant's .40 caliber handgun, three spent shell casings, and Mr. Victorian's wooden stick. He searched Defendant's vehicle and found another fully loaded ten-round clip of .40 caliber bullets, and boxes of .40 caliber and .357 Magnum bullets. He also recovered a cell phone from Defendant at the police station. Lieutenant Powers also searched Mr. Victorian's vehicle and found a 22-ounce beer bottle, a prescription bottle of Prozac, and a box of .380 caliber bullets but no weapon. Tests performed on a sample of Mr. Victorian's blood showed that he had a blood alcohol level of .26 milligrams.

A few weeks before the shooting, Carol Craig, another one of Defendant's employees, told him that Mr. Victorian had told her that he was out to get him. Ms. Craig worked part time for Defendant and part time for Centennial Wireless. She testified that Mr. Victorian visited her store to purchase service about two to three weeks before the shooting. When Ms. Craig asked Mr. Victorian how his family was doing, he told her his wife was sleeping with an old "MF" and named Defendant. Mr. Victorian told her that he was going to cripple Defendant for the rest of his life, explaining that he would use an axe handle that he kept in his car. Ms. Craig also testified that Mr. Victorian told her that he had almost gotten Defendant one night outside the hospital, but someone had walked up to Defendant, so he left him alone. Ms. Craig believed Mr. Victorian was serious when he threatened Defendant. She testified that she told Defendant about the threats approximately one week after Mr. Victorian made them because she was scared to work at his office.

The night before the shooting, Mr. Victorian worked the night shift from 6:00 p.m. to 6:00 a.m. at Pine Prairie Correctional Facility. His co-worker, Christopher Scott Paul, testified that during that time Mr. Victorian told him he was married, had a beautiful wife, two beautiful children, and a good marriage until his wife started cheating on him and that Mr. Victorian named Defendant as the man involved with his wife. Mr. Paul further testified that Mr. Victorian told him he wanted to bust Defendant's knee caps with an axe handle wrapped in duct tape to make him suffer. Mr. Paul also testified that Mr. Victorian told him he was going to do something to his wife as well. Mr. Paul testified that he and another co-worker, Charlene Dupre, tried to talk Mr. Victorian out of his plans. According to Mr. Paul, the stick in Mr. Victorian's possession at the time of his death fit the description of

the stick he planned to use on Defendant. Ms. Dupre testified that around 2:00 or 3:00 that morning Mr. Victorian stated that, after he got off work, he was going to get his revenge against Defendant. There is no evidence that Defendant had knowledge of these threats before his encounter with Mr. Victorian.

Calcasieu Parish Coroner Terry Welke, an expert in forensic pathology, testified that Mr. Victorian had three gunshot wounds, one to the left outer chest, one to the right forearm, and one to the back left shoulder. The fatal bullet traveled from Mr. Victorian's left front chest to the right side of his back in a slightly upward position. He testified that the wound on Mr. Victorian's forearm could have been sustained if Mr. Victorian was holding an object. However, he also testified that the injury could have occurred if Mr. Victorian was standing with his arm down at his side.

Mr. Welke could not determine the exact distance between Mr. Victorian and the shooter on the chest or forearm wounds and estimated it to be at least two feet, but he acknowledged that the distance could have been a little closer than two feet. With regard to the wound on Mr. Victorian's left back shoulder, Mr. Welke testified that the barrel of the gun was in close proximity to the skin when that shot was fired because the injury contained gun powder, soot, and there was a line caused by the barrel of the gun. He also testified that Mr. Victorian's back was toward the end of the gun barrel and agreed that, hypothetically, the shoulder wound could have occurred when Mr. Victorian turned to swing an object at the shooter. This testimony was uncontradicted.

Bob Frye of the Southwest Louisiana Crime Lab testified as an expert in firearm and tool marking. He stated that the three spent shell casings in evidence

11

were fired from Defendant's .40 caliber weapon. He determined that the weapon was approximately two feet from Mr. Victorian's chest when it was fired because there was gun powder on the T-shirt Mr. Victorian was wearing when he was shot.

The State had the burden of proving that Defendant did not shoot Mr. Victorian in self-defense; therefore, we must determine whether he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that killing Mr. Victorian was necessary to save himself from that danger. La.R.S. 14:20; *State v. Brown*, 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488. Because there were no witnesses to the shooting other than Defendant, the State had to rely on circumstantial evidence to disprove his self-defense claim. Where an essential element of a crime is sought to be proven by circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La.R.S. 15:438.

When all of the evidence presented by the State is examined in the light most favorable to the prosecution, it is legally insufficient to meet the State's heavy burden of proof for the purpose of excluding every reasonable hypothesis that Defendant did not shoot Mr. Victorian in self-defense.

The trial court determined that Defendant could have exited the passenger's door of the Suburban and escaped to safety in the police station. While the possibility of escape is a factor to be considered when determining whether or not the defendant reasonably believed deadly force was necessary to avoid danger, there is no unqualified duty to retreat. *State v. Carrier*, 95-1003 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431. Furthermore, it is not the only factor to be considered: the excitement and confusion of the situation, the possibilities of using force or violence short of killing, and the defendant's

12

knowledge of the assailant's bad character are other factors to be considered. *State v. Nelson*, 34,077 (La.App. 2 Cir. 12/6/00), 775 So.2d 579; *State v. Hudson*, 33,357 (La.App. 2 Cir. 5/10/00), 760 So.2d 591.

The trial court's suggestion that Defendant could have retreated does not take into account Mr. Victorian's speed in exiting from his car with his weapon and charging Defendant. Defendant testified that Mr. Victorian was in front of his car charging toward him when he first saw him in the parking lot. The trial court's conclusion also does not consider the time in which these events occurred. Ms. Coleman testified that she heard shots within five seconds of having exited the Suburban, and Officer Reese testified that she heard shots within two seconds of Ms. Coleman entering the station. The trial court's conclusion also does not consider the difficulty Defendant would have had trying to maneuver over the console of the Suburban under the circumstances: he knew Mr. Victorian had threatened his life and Mr. Victorian was in close proximity to him with a weapon that Defendant believed was a shotgun. Furthermore, Defendant's door was closer to the police station than the passenger's door, and he would have had to cross Mr. Victorian's path to get to the police station, even if he exited the passenger's door.

The physical evidence supports Defendant's claim that he was in imminent danger of death or severe bodily injury when he shot Mr. Victorian. Residue on the back of Mr. Victorian's left back shoulder indicates that Defendant's gun was in close proximity to the skin when the shot was made. This corroborates Defendant's testimony that he first shot Mr. Victorian as he charged him with his weapon raised over his shoulder to strike him. Additionally, Defendant's gun was within two feet of Mr. Victorian when his chest wound and his forearm wound were inflicted and the

13

fatal bullet traveled in a slightly upward path. Furthermore, Mr. Victorian's body was positioned at or near the door of Defendant's Suburban, and Mr. Victorian's weapon was near the back wheel of the Suburban in a position consistent with it having fallen from his hands when he fell.

Mr. Victorian's actions justify Defendant's fear and actions. Defendant sought refuge at the Oakdale Police Station, but Mr. Victorian was not deterred. He continued his pursuit of Defendant in the parking lot, charging him with a weapon. He was also not deterred by Defendant's possession of a gun when he exited his vehicle. Mr. Victorian's blood alcohol content was .26, which probably contributed to, and may have heightened, his irrational behavior.

Lastly, Defendant's demeanor as he entered the police station also corroborates his belief that he was in imminent danger from Mr. Victorian–he was described by Officer Hutchins as nervous, scared, and trying to get away from Mr. Victorian.

The evidence leads to the conclusion that Defendant's fear and belief that he was in imminent danger of being killed or seriously injured by Mr. Victorian were reasonable.

### *Disposition*

Defendant's conviction is reversed; his sentence is vacated and set aside, and an acquittal is ordered entered of record.

**REVERSED; ACQUITTAL ORDERED.**