NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-1004


STATE OF LOUISIANA

VERSUS

ROSALYN FAITH BREAUX


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. 492-14
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Phyllis M. Keaty, Judges.


AFFIRMED.

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana  70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
        **Rosalyn Faith Breaux**

**Michael C. Cassidy**
**District Attorney**
**Kevin D. Millican**
**Assistant District Attorney**
**Post Office Box 1388**
**Jennings, Louisiana  70546**
**(337) 824-1893**
**Counsel for Appellee:**
        **State of Louisiana**

**KEATY, Judge.**

Defendant, Rosalyn Faith Breaux, appeals her conviction and sentence for negligent homicide. For the following reasons, Defendant's conviction and sentence are affirmed.

**FACTS AND PROCEDURAL BACKGROUND**

On June 6, 2014, Defendant was at a house in Welsh, Louisiana, when a gun she was holding discharged, killing Jeremy Ardoin (Jeremy) and wounding Nicholas Coble (Nick). At the time of the shooting, Defendant was living at that house with Jeremy and his brother, Tommy Ardoin (Tommy). On August 26, 2014, Defendant was charged with the second degree murder of Jeremy, in violation of La.R.S. 14:30.1, and pled not guilty.[1] Following a January 30, 2015 jury trial, Defendant was found guilty of negligent homicide in violation of La.R.S. 14:32.[2] On May 4, 2015, Defendant was sentenced to serve five years at hard labor, which is the maximum sentence for negligent homicide. Although no contemporaneous objection was made during the sentencing, a motion to reconsider was filed on May 5, 2015, alleging Defendant's sentence was excessive. It was denied that same day. Defendant subsequently appealed her conviction and sentence.

On appeal, Defendant asserts the following three assignments of error:

I.) The State failed to prove beyond a reasonable doubt that Appellant was not acting in self-defense to prevent either great bodily harm or death to her by Nicholas Coble.

---

[1] The record shows that Defendant was charged in docket number 14-492 with the second degree murder of Jeremy. Defendant was also charged with the attempted second degree murder of Nick in docket number 14-493. The cases were joined on January 7, 2015 and tried together.

[2] The record shows that Defendant was simultaneously found not guilty of the attempted second degree murder charge in docket number 14-493.

II.) The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Rosalyn Breaux committed negligent homicide of Jeremy Ardoin.

III.) The sentence imposed by the trial court is constitutionally excessive and is a violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution.

## DISCUSSION

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

### II. First Assignment of Error

In her first assignment of error, Defendant contends the State failed to prove beyond a reasonable doubt that she was not acting in self-defense to prevent great bodily harm or death to her by Nick. Self-defense in homicide claims was discussed by this court in *State v. Miller*, 98-642, p. 4 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, 831-32, *writ denied*, 98-3119 (La. 5/14/99), 741 So.2d 659, as follows:

> When a defendant in a homicide prosecution asserts that he acted in self-defense, he does not have any burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Hall*, 91-1296 (La.App. 3 Cir. 10/6/92); 606 So.2d 972; *State v. Patterson*, 295 So.2d 792 (La.1974); *State v. Carrier*, 95-1003 (La.App. 3 Cir. 3/6/96); 670 So.2d 794, *writ denied*, 96-0881 (La.9/20/96); 679 So.2d 431; *State v. Makar*, 578 So.2d 564 (La.App. 3 Cir.1991). This court has characterized this burden of proof as a heavy one in which the state must "exclude every reasonable hypothesis of justification by self-defense." *Makar*, 578 So.2d at 569. When a defendant claims, on appeal, that the state failed to prove a homicide was not committed in self-defense, the standard of review is that of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d

2

560 (1979), that is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the homicide was not committed in self-defense. *Makar*, 578 So.2d 564.

In this case, we must determine whether any rational trier of fact could have found that Jeremy's death was not committed by Defendant acting in self-defense. We look to the trial testimony and evidence to see if the State excluded every reasonable hypothesis of justification by self-defense. At trial, the State provided the live testimony of Officer Matt Doucet of the Welsh Police Department. Officer Doucet testified that he was on duty when the shooting occurred and was dispatched to the house in question shortly thereafter. He stated that once he arrived and knocked on the door, Defendant opened it and "stated that he's in the back. I shot him." Officer Doucet indicated that Defendant "was hysterical." The State then introduced as an exhibit a video recording from his police car, which included a dashboard camera, an interior camera, an interior microphone, and a wireless microphone connected to Officer Doucet's belt. The dashboard camera video corroborates Officer Doucet's testimony showing Defendant hysterically crying, screaming, jumping around, and pleading with God. Officer Doucet's testimony is further corroborated by the trial testimony of Chief Marcus Crochet and Officer Chad Romero, who both stated that upon their arrival at the house, they separately spoke to Defendant who advised them she shot Jeremy.

The State also submitted into evidence the video-taped interview between Detective Aaron Istre and Defendant on the day of the shooting. Therein Defendant told Detective Istre she was holding the gun that accidentally discharged and killed Jeremy. Defendant claimed Nick had previously beaten her and that on the day in question, Nick threatened her and grabbed her arm. This is corroborated

3

by Detective Istre's trial testimony on cross-examination that he noticed marks on her arm during their interview. The video-taped interview further shows Defendant's allegation that Nick tried to remove the gun from her hand after she loaded it, and she told him to leave her alone. Defendant claimed Jeremy was attempting to get Nick off of her when the gun fired although she mistakenly believed the safety was engaged before the shooting. Defendant claimed she was unfamiliar with the gun and unaware that Nick had also been wounded by the shot.

Detective Istre also testified at trial on behalf of the State. He agreed that he was the lead investigator who interviewed Defendant via video tape on the day of the shooting. On cross-examination, Detective Istre testified that the gun was tested for fingerprints although he admitted it was not tested to determine its working condition. Detective Istre stated that Nick's reputation for truthfulness in the community was "[n]ot very well[]" and that he exhibited past violent behavior. On re-direct examination, Detective Istre stated that the marks on Defendant's arms that he noticed during her interview looked like old, faded bruises. He also testified that after handling the gun in question and admitting that he owned a similar type of gun, the subject gun seemed to be functioning normally.

The State also produced the live testimony of Dr. Terry Welke, the Calcasieu Parish coroner, who testified as an expert forensic pathologist. Dr. Welke noted that Jeremy's death certificate, which was admitted into evidence, lists his cause of death as a gunshot wound whereas his manner of death is listed as a homicide. Dr. Welke explained that the homicide designation simply meant that Jeremy was killed by another person. The State also introduced Jeremy's autopsy photographs which Dr. Welke identified. Pursuant to a photograph showing the entrance bullet hole in Jeremy's body, Dr. Welke opined that the gun barrel was

4

approximately six inches to two feet away from him when it discharged. Dr. Welke's opinion was based on the compactness of the entry wound and the presence of soot around it, which indicated there was no one in between Jeremy and the barrel of the gun when it was discharged. On cross-examination, Dr. Welke reaffirmed that the classification of Jeremy's manner of death as a homicide does not show intent but merely acknowledges that someone other than Jeremy inflicted the deadly wound. Dr. Welke stated that if another individual was hit with pellets from the same shot that killed Jeremy, that person would have been standing behind him.

Defendant's brother, Joshua Breaux, also testified at trial on behalf of the State. He stated that a few days prior to the shooting, he was outside of his father's house in Jennings, Louisiana, when Nick brought Defendant to the residence. Although Joshua agreed to being "under the influence" when they arrived, he remembered that Nick and Defendant exited the vehicle and were searching through the car while arguing with each other. Their argument ensued, according to Joshua's recollection, because Nick had taken Defendant's money. Joshua stated that Nick thereafter walked around the car when Defendant told Joshua that Nick had previously beaten her. At that point, according to Joshua, he got in between Defendant and Nick. He testified that Nick subsequently got into the car and left.

Nick also testified at trial on behalf of the State. He stated that he had been friends with Tommy and Jeremy for approximately twenty years and that he introduced Defendant to Tommy a few weeks before the shooting. Nick testified that Defendant called him the day before the shooting, advising that she had robbed someone at the house and that she needed him to pick her up in Welsh and

5

bring her to Jennings. Nick stated that when he picked her up, she got into the car with a large duffel bag. Nick stated that Defendant would not exit his car when they finally arrived at her father's house, which prompted him to ask Joshua to get her out. According to Nick's testimony, Joshua removed Defendant and Nick thereafter left.

Nick further testified that on the morning of the shooting, he and Ronnie Owens initially passed by the house, although no one answered when he knocked on the door. Nick indicated that he later returned alone and saw Defendant and Jeremy, on the outside porch, painting a lamp. Nick stated that he began talking to Jeremy when Defendant went into the house. Nick testified that although Jeremy gave him permission to take a shower and wash some clothes inside the house, he actually took a nap in the recliner. Nick stated that after his nap, he looked for his cell phone which was missing. He testified that Jeremy, who had also taken a nap, told him that Defendant borrowed the phone and that she probably still had it. Nick testified that he proceeded to the back of the house to retrieve the phone from Defendant who screamed and swore at him. Nick claimed that he retreated back to the living room and told Jeremy that Defendant advised that she did not have his phone. Nick indicated that he followed Jeremy back into the bedroom wherein they both told Defendant to return Nick's phone when Defendant grabbed a gun and "start[ed] coming this way[.]" Nick indicated that at that point, he started to exit the room but remained because Jeremy was not moving. He testified that while he was standing behind Jeremy, he asked Defendant what she was going to do with the gun, and "[s]he just shot." Nick stated that after the gun fired, Defendant "didn't say anything. She just . . . had that crazy look kind of like she was in shock like I was."

6

Nick testified that following the gunshot, he ran to the neighbor's house and called 9-1-1. Nick agreed that he recognized the gun at issue as he had previously seen Tommy give Defendant that gun to use on intruders when she first moved into the house. Nick stated that he never approached Defendant nor attempted to remove the gun from her.

As to Defendant's allegations that Nick had previously beaten her, he testified that she had previously been aggressive towards him when they were doing drugs. Nick stated that her aggressiveness made him push her away and onto a couch where Defendant started punching herself. He noted that the police were not called to the house that day. Nick also talked about his history of domestic violence incidents with his child's mother, Julie Vincent, which he claimed occurred years before he met Defendant. In that regard, Nick admitted on cross-examination to being convicted of two altercations with Julie. He testified that he pled guilty to simple battery resulting from allegations that he pulled her hair, slapped her, and threw her against a wall. Nick further admitted to pleading guilty to disturbing the peace, which charge had been amended down from a simple battery committed on Julie. He stated that he also pulled a knife on Jeremy's brother-in-law during an altercation at a gas station after the shooting.

On cross-examination, Nick admitted that during his second interview with Detective Istre, he stated that he was under the influence of drugs on the day of the shooting which rendered him unable to remember anything. Nick acknowledged at trial, however, that his statement was said out of frustration because of his previous arrest stemming from the gas station incident with Jeremy's brother-in-law. Nick also admitted to lying during the same interview regarding his knowledge of a silver key chain containing methamphetamine that was located after the shooting.

Nick stated that he had no problem lying to people when he believed they were attacking him. He acknowledged his previous testimony that Defendant did not mean to shoot Jeremy and that she looked scared when the gun discharged. Nick stated that he never moved in front of Jeremy, reached around Jeremy, or attempted to remove the gun from Defendant.

The State's final witness was Jeremy's brother, Tommy, who owned the house in which the shooting occurred. He testified that he had known Defendant for approximately three weeks prior to the shooting and that they were "dating but sort of off-and-on." He stated that he had helped Defendant secure a bed at a drug rehabilitation facility where she was supposed to report on the day of the shooting. Tommy testified regarding a previous incident that occurred while he was working offshore. He stated that Defendant called him and advised that she and Nick were fighting, which prompted Tommy to instruct his other brother, Scott Ardoin, to go to the house and tell Nick to leave. Tommy indicated that upon Scott's arrival, he did not see any scratches or bruises on Defendant. Tommy testified that when he returned from working offshore, he, likewise, failed to see any scratches or bruises on Defendant.

Tommy stated that the gun used in the shooting was kept behind his bedroom door. He further testified that the crack barrel gun at issue, which he had owned for twenty-five years, was functioning properly the last time he used it. He indicated he left three shotgun shells on the dresser only for protection.

On cross-examination, Tommy agreed that he told Nick that he was not allowed at the house while Tommy was at work. He acknowledged that Defendant told him she was scared of Nick, but he noted that she would also call Nick for drugs.

8

Jeanette Lyons testified that she lived next door to Tommy's house. She stated that prior to the shooting, Defendant told her that Nick had beaten her and had stolen her medicine and keys. She admitted that she had not witnessed the altercation between Nick and Defendant.

Defendant's version of the events was that she was in her bedroom when she became scared because Nick threatened her. As a result, she grabbed a gun that she did not know how to use, loaded it, and attempted to make Nick retreat by pointing the gun towards him. Nick grabbed Defendant's arm when he tried to remove the gun from her hand. Jeremy tried to separate them when the gun discharged, killing Jeremy.

After viewing the foregoing evidence in the light most favorable to the State, any rational trier of fact could have found that the shooting was not committed in self-defense. If the jury chose to believe Nick's version of the events, his testimony shows that Defendant pointed a loaded gun that she did not know how to use at two people who were not threatening her, and the gun subsequently discharged, killing one of them. A rational trier of fact, therefore, could have found that the shooting was not committed in self-defense. Accordingly, we find that Defendant's first assignment of error lacks merit.

### III. Second Assignment of Error

In her second assignment of error, Defendant alleges that the evidence introduced at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, standard, was insufficient to prove beyond a reasonable doubt that she committed the negligent homicide of Jeremy. Negligent homicide is "[t]he killing of a human being by criminal negligence." La.R.S. 14:32(A)(1). "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such

9

disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12.

An offender is convicted of criminal negligence when the State meets its burden of proving, beyond a reasonable doubt, that the offender killed another person by criminal negligence. *State v. Bowie*, 95-795 (La.App. 3 Cir. 11/13/96), 684 So.2d 68, *writ granted*, 96-2987 (La. 1/31/97), 687 So.2d 369.

> The State is required to show more than a mere deviation from the standard of *ordinary care* to establish proof of criminal negligence. *State v. Jones*, 298 So.2d 774 (La.1974). The negligent homicide statute proscribes conduct that goes beyond carelessness, mistake, error in judgment or omission of duty. *State v. Fenner*, 94-1498 (La.App. 4 Cir. 11/16/95), 664 So.2d 1315. It is more than the mere failure to do something which a reasonable and prudent man would do, or the mere doing of something which a reasonable and prudent man might not do, *on cool reflection*, after considering the degree of harm likely to follow. Further, the "consequences" alone do not determine the criminal culpability of the actor. Our law recognizes an actor's conduct may be justifiable when he reasonably believes such killing is necessary to save his life or prevent him from receiving great bodily harm. La.R.S. 14:20(1).

*Id*. at 70.

In this case, Defendant's actions undoubtedly resulted in Jeremy's death. After having accepted that the State met its burden of disproving self-defense, the remaining question is whether Defendant's actions constituted criminal negligence. This court, therefore, must utilize the *Jackson*, 443 U.S. 307, standard of review and determine whether, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found Defendant's actions constituted criminal negligence beyond a reasonable doubt.

Defendant attempts to show that she was not criminally negligent by citing *State v. Alexander*, 04-788 (La.App. 3 Cir. 11/17/04), 888 So.2d 401, in which this

court overturned the defendant's negligent homicide conviction on the grounds that the State failed to disprove self-defense. This comparison, however, is flawed given our finding that the State met its burden of disproving self-defense in this case. As shown above, the only evidence directly pointing to self-defense is Defendant's own statements to police after the shooting. Other than her own testimony, there is no evidence or witness testimony supporting Defendant's claim that she felt threatened, other than second-hand testimony alleging that Nick previously hit her.

*Alexander*, 888 So.2d 401, is also factually distinguishable from the instant matter in that the parties involved a jealous husband who sought out his soon-to-be ex-wife and the new man in her life, the defendant. Multiple witnesses testified that the victim was threating the defendant for weeks prior to the shooting. The shooting took place in the police station parking lot where the victim, who was armed with a weapon, attempted to attack the defendant as he was trying to enter the police station. At that point, the defendant shot and killed the victim out of fear for his safety.

In the instant case and unlike *Alexander*, Defendant did not shoot and kill Jeremy out of fear for her safety given our finding that self-defense has been disproven. We, therefore, must determine whether retrieving and pointing a loaded gun at two people who were not threatening her, a gun with which Defendant claimed she was not familiar, constitutes "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful [wo]man under like circumstances." La.R.S. 14:12.

11

We are guided by *State v. McFerson*, 583 So.2d 516 (La.App. 3 Cir.), *writ denied*, 588 So.2d 113 (La.1991), wherein this court affirmed the trial court's finding of criminal negligence. The facts show that the defendant and three friends went into a nightclub and consumed alcoholic beverages when the defendant's gun discharged, striking and killing a twenty-one-year-old victim. The defendant admitted that when he pulled the gun out of his pocket to place it in the front of his pants, someone bumped him which caused the gun to discharge. In affirming the trial court's judgment, this court stated that "[w]e cannot fathom a greater disregard for the safety of others than handling a loaded gun in a crowded barroom." *Id*. at 519.

We, therefore, find that Defendant's actions in the instant matter, similar to *McFerson*, show a blatant disregard for the safety of others given the scenario presented to the trial court, while employing the *Jackson*, 443 U.S. 307, standard of review. Accordingly, Defendant's second assignment of error lacks merit.

## IV. Third Assignment of Error

In her third assignment of error, Defendant contends that her sentence is constitutionally excessive and is a violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution. Defendant's trial counsel timely filed a motion to reconsider sentence and alleged that the sentence was excessive, which was denied without a hearing.

The mechanism for preserving the review of a sentence on appeal is codified at La.Code Crim.P. art 881.1, which provides:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.

12

. . . .

E.     Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Louisiana courts have provided the following guidelines regarding the review of excessive sentence claims:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In this case, Defendant's negligent homicide conviction carries a penalty of imprisonment with or without hard labor for not more than five years and/or a five thousand dollar fine. La.R.S. 14:32(C)(1). Defendant's five-year sentence represents a maximum term of imprisonment although she was not subjected to a fine. In reviewing the *Lisotta*, 726 So.2d 57, factors, we note that negligent homicide is not defined as a violent crime. This case, however, involves the shooting death of a person, who was either an innocent bystander and/or attempting to protect Defendant, depending on whose story is believed. Regarding the nature and background of Defendant, she was in her mid-to-late twenties, had no prior felony convictions, and was a drug-addict who lost custody of her four children.

When evaluating sentences given to defendants for similar crimes, we acknowledge that "[t]he trial judge is given great discretion in the imposition of sentences within statutory limits, and the sentence should not be set aside in the absence of abuse of his discretion." *State v. Bradley*, 414 So.2d 724, 725 (La.1982). The relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more

appropriate.'" *State v. Cook*, 674 So.2d at 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)).

As discussed in the cases below regarding the imposition of maximum sentences for negligent homicide, Louisiana courts have affirmed sentences ranging from three to five years, although sometimes with suspended sentences and under different circumstances. Many of the cases also involved negligent homicide automobile accidents rather than shootings. Specifically, in *State v. Rogers*, 07-276 (La.App. 3 Cir. 10/3/07), 966 So.2d 1212, this court affirmed the trial court's sentence of three and one-half years imprisonment plus a thousand dollar fine where the defendant, who was driving at an excessive rate of speed with the victim and her young son as passengers, crashed. The victim remained in the car and was burnt beyond recognition while the defendant hitchhiked to the victim's parent's house and left the victim's son on the porch. *Id.* After he returned home, the defendant failed to report the incident. *Id.*

The *Rogers* court looked to its prior holding in *State v. Hughes*, 03-420 (La.App. 3 Cir. 12/31/03), 865 So.2d 853, *writ denied*, 04-663 (La. 9/24/04), 882 So.2d 1165, wherein the third circuit affirmed a five-year sentence for negligent homicide. The facts show that after the defendant and her estranged husband got into an argument, she attempted to commit suicide by driving her car into the path of a pickup truck driven by the victim. The victim died as a result of the impact. Even though the defendant was a first time felony offender and a mother of four children, this court held that the maximum five-year sentence was not excessive.

The imposition of maximum sentences was discussed in *State v. Webre*, 09-351, pp. 3-4 (La.App. 3 Cir. 11/4/09), 21 So.3d 1154, 1156-57, as follows:

In *State v. Burnaman*, 03-1647, p. 5 (La.App. 3 Cir. 5/12/04), 872 So.2d 637, 641, this court considered the appropriateness of the imposition of maximum sentences, explaining:

> [M]aximum sentences are usually reserved for the most egregious and blameworthy of offenders. *State v. Leblanc*, 578 So.2d 1036 (La.App. 3 Cir.1991), *writ denied*, 620 So.2d 833 (La.1993). In reviewing the imposition of a maximum sentence, the First Circuit has held:
>
>> This Court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, *State v. Easley*, 432 So.2d 910, 914 (La.App. 1 Cir.1983), or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. *See State v. Chaney*, 537 So.2d 313, 318 (La.App. 1 Cir.1988), *writ denied*, 541 So.2d 870 (La.1989). A trial court's reasons for imposing sentence, as required by La.Code Crim. P. art. 894.1, are an important aid to this court when reviewing a sentence alleged to be excessive. *State v. McKnight*, 98-1790 at p. 25, 739 So.2d [343] at 359 [(La.App. 1 Cir.1999)].
>
> *State v. Runyon*, [05-36, 05-104, pp. 22-23 (La.App. 3 Cir. 11/2/05),] 916 So.2d [407,] 423-24[,*writ denied*, 06-1348 (La.9/1/06), 936 So.2d 207].

*State v. Runyon*, 06-823, p. 12 (La.App. 3 Cir. 12/6/06), 944 So.2d 820, 830, *writ denied*, 07-49 (La.9/21/07), 964 So.2d 330.

The defendant in *Webre*, 21 So.3d 1154, received the maximum sentence which this court affirmed on appeal. This court noted that the defendant had a criminal history, including prior driving while intoxicated (DWI) and hit-and-run convictions, and showed a lack of remorse. *Id.*

The foregoing jurisprudence shows that Louisiana courts have frequently affirmed a wide range of sentences for negligent homicide convictions. Although Defendant in this case contends that a lesser sentence coupled with drug treatment

is more appropriate, we keep in mind that the relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" *State v. Cook*, 674 So.2d at 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)). Accordingly, we cannot say that the trial court abused its discretion, and we affirm Defendant's conviction and sentence. Defendant's assignment of error is without merit.

## DECREE

Defendant, Rosalyn Faith Breaux's, conviction and sentence for negligent homicide are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.