STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-92

STATE OF LOUISIANA

VERSUS

JUSTIN SAVOY

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 101521
HONORABLE J. BYRON HEBERT, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney, 15th JDC**
**J. N. Prather, Jr.**
**Assistant District Attorney**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**Counsel for State-Appellee:**
  **State of Louisiana**

**Jason Wayne Robideaux**
**Attorney at Law**
**1005 Lafayette Street**
**Lafayette, LA 70503**
**(337) 291-9444**
**Counsel for Defendant-Appellant:**
  **Justin Savoy**

**James E. Beal**
**Louisiana Appellate Project**
**P.O. Box 307**
**Jonesboro, LA   71251-0307**
**(318) 259-2391**
**Counsel for Defendant-Appellant:**
**Justin Savoy**

**Pickett, Judge.**

## FACTS

On December 5, 2003, the defendant, Justin Savoy, had an altercation with Jermaine "Tito" Duhon. Later, the defendant appeared in the street near Duhon's grandmother's house, where Duhon had gone after that altercation had ended. During a second altercation at that location, the defendant stabbed Duhon, who subsequently died as a result of the stab wounds.

On January 21, 2004, the defendant was indicted by a grand jury for second degree murder, a violation of La.R.S. 14:30.1.

On August 27, 2004, following the trial, the jury found the defendant guilty as charged. On that same date, the defendant waived the delay in sentencing, and the trial court sentenced him to life imprisonment at hard labor. The trial court further specified that the sentence was to be served without benefit of parole, probation or suspension of sentence.

On September 9, 2004, the defendant filed a motion for appeal. The defendant is now before this court on appeal and alleges, as assignment of error, that the evidence was not sufficient to convict him of second degree murder.

On March 24, 2005, the defendant filed a supplemental brief, pursuant to an order by the clerk of this court, asserting an additional assignment of error. In that brief, the defendant asserts that the trial court erred in allowing the jury, during deliberations, to listen to an audiotape of his confession and to view written evidence without a waiver of his rights under La.Code Crim.P. art. 793.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ORIGINAL ASSIGNMENT OF ERROR

In his appeal to this court, the defendant asserts that the evidence was not sufficient to sustain his conviction of second degree murder, but rather shows that the homicide was committed in self-defense.

The elements of second degree murder are set forth in La.R.S. 14:30.1, which provides, in pertinent part, that "[s]econd degree murder is the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm . . . ." The defendant claimed at trial that he acted in self-defense and that the evidence was, therefore, insufficient to sustain his conviction for second degree murder. Louisiana Revised Statutes 14:20 provides that a homicide is justifiable: "(1) [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of

review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

This court recently recognized that "[w]hen a defendant claims that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that he did *not* act in self defense." *State v. Alexander*, 04-788, p. 1 (La.App. 3 Cir. 11/17/04), 888 So.2d 401, 402. (*citing State v. Brown*, 414 So.2d 726 (La.1982)). The defendant claims that the state failed to prove beyond a reasonable doubt that the homicide was not committed in self-defense; thus, the conviction should be reversed. Under the *Jackson* standard, this court must determine whether any rational finder of fact could have found that the evidence, viewed in the light most favorable to the prosecution, proved beyond a reasonable doubt that the defendant did not act in self-defense. In his brief to this court, the defendant does not enumerate facts alleged to support his allegation that he reasonably believed he was in imminent danger, sufficient to show that the homicide was justifiable under La.R.S. 14:20. Therefore, in order to fully analyze the defendant's claim, we will discuss all of the events occurring on the night in question in light of the actions or statements which the defendant may have reasonably perceived to be threatening. In order to clarify the events, we will discuss the two altercations separately.

At trial, five witnesses testified that they were present at either one or both of the two separate altercations between the defendant and Duhon on the night of December 5, 2003. The defendant also testified. The testimony of the various witnesses conflicts on several points.

3

THE FIRST ALTERCATION

On the evening in question, the defendant and Duhon were "hanging out" with Jason Christian and Nathaniel Davis. At some point during that evening, the defendant and Duhon began an argument which escalated into a physical fight. Both Christian and Davis testified that they broke up the fight, and that Duhon and the defendant each left the scene separately. However, the defendant testified that Christian and Davis, rather than breaking it up, encouraged the fight, and then held onto his arm and his shirt as he was trying to walk away.

Before leaving the scene, Duhon allegedly made threatening statements to the defendant. According to Christian's testimony, Duhon told the defendant he was going to "burn" him. Whitney Phillips, who witnessed the fight, also testified that she heard Duhon tell the defendant "I'm going to burn you before you burn me."

Davis testified that after the fight, he continued to talk to the defendant, who had gone down the street to use a pay phone. Davis also stated that after the defendant made a call, a gray car pulled up, and the defendant asked its occupants to take him to his home so that he could get his gun. Davis then said that the defendant left the scene, but in a different car. Whitney Phillips also stated that the defendant went to the home of her mother, Victoria Phillips, to use the telephone, but she did not state whether she saw him leave the area. The defendant also testified that he went to the home of Phillips' mother, Victoria Elaine Phillips, to use the phone, but after he was unable to find someone willing to pick him up, he left the area on foot. Victoria Phillips testified that the defendant used a pay phone located adjacent to her home, but she did not state whether she saw the defendant leave the area.

4

According to witness Alton Phillips, Whitney Phillips' brother, the defendant came to his house in a blue or silver car with two other male individuals, told Phillips of the altercation, said that he had been "jumped," and asked Phillips to "watch his back." Phillips stated that when he refused to offer him assistance, the defendant left Phillips' house in the same car.

Christian and Davis testified that as the defendant departed, Duhon also left the scene in an automobile and subsequently arrived at the home of his grandmother. Whitney Phillips stated that Duhon got into a car driven by Albert Francis. Albert Francis testified that he arrived at the scene of the first altercation after Duhon and the defendant had been separated and that Duhon got into his car. Francis stated that Duhon told him that he had beaten up the defendant. Francis then testified that after driving him around for some time, he dropped Duhon off at the corner of Magnolia and Fourteenth, adjacent to Duhon's grandmother's house. Francis then stated that Duhon told him that he was finished with the fight, and that it was over. Francis then left the scene.

Following the departures of the defendant and Duhon from the scene of the first altercation, Christian stated that he and Davis left the scene to "walk around the [neighbor]hood." Davis stated that he and Christian "went back to the corner" where they were hanging out. Davis and Christian each stated that they were together near Duhon's grandmother's house when Duhon arrived at that location, and that they spoke with him at that time. Davis testified that he and Christian left that area briefly but later returned. At that time, Duhon was still outside his grandmother's house. At that point, Davis testified, he told Duhon that he should go inside his grandmother's house because the defendant had said he was going to get a gun.

5

THE SECOND ALTERCATION

Shortly after Duhon arrived at his grandmother's home, the defendant also arrived at that location. Christian and Davis testified that the defendant arrived in a blue car. The defendant testified that he happened to be walking through the area on his way home when he came upon the location where Christian, Davis and Duhon were situated. The defendant further stated that a blue car, driven by Leonard Simpson, had pulled up and that Simpson had gotten out to speak to him when he first saw the three approaching. Simpson also testified that he first saw the defendant walking on Magnolia Street and that when he stopped to talk to him, he saw Christian, Davis and Duhon approach.

Alton Phillips, who testified that the defendant had unsuccessfully sought his assistance after the first altercation, stated that he later went to look for the defendant and that he drove his blue car to the area around Magnolia Street. He stated that when he first drove through the area he did not see anyone, but that on his second pass, he saw Duhon and his friends, as well as the car in which he had earlier seen the defendant. Phillips stated that Duhon and the defendant were exchanging words, and that the friends of Duhon were attempting to end the argument. He also stated that he told the group to "just let them get it off their chest now because them boys they're going to fight either tonight, tomorrow and then get drunk later on. So y'all might as well let them fight now."

Simpson, who stated that he had arrived at the scene in his blue car, also testified that Alton Phillips was present, and that Phillips had a firearm. He further testified that when Duhon and his two friends approached the defendant, Duhon "ran up" on the defendant with a gun in his hand. Simpson said that he yelled a warning

6

at the defendant, and that the defendant then swung first his left, and then his right arm to protect himself. Similarly, the defendant testified that while he was talking to Simpson, Phillips pulled up, and that he was wielding a gun. The defendant stated that when Simpson yelled out a warning, he reflexively swung back because he knew that Duhon was running up to him. The defendant then explained that he had a knife in his hand at the time because he always carried a knife when he walked the streets late at night. The defendant also stated that Duhon had a gun, and that although he did not see it because his back was turned, the gun fell to the ground. Later however, the defendant testified that he did not see a gun in Duhon's possession, nor did he look for a gun on the ground. He stated rather, that Duhon had "a weapon" and that he had something in his pants that the defendant couldn't see. The defendant acknowledged that he did not mention Phillips' possession of a gun to the police upon subsequent questioning.

The defendant testified that after he stabbed Duhon, and as he was leaving the scene, he told Davis to call an ambulance. At that point, Duhon's friends told the defendant to leave. The defendant stated that he got into Simpson's car and that they went to the residence of a cousin of the defendant. Simpson said that he dropped the defendant off at a location on Kaliste Saloom Road. The defendant testified that he slept on his cousin's couch, and later received a call informing him that he was being sought by the police for the death of Duhon. The defendant subsequently turned himself in to the police.

The testimony of the witnesses who saw the altercation which resulted in the death of Duhon is inconsistent. Davis, Christian, Alton Phillips and Whitney Phillips testified that they did not see Duhon with a gun, or any other type of weapon, while

7

the defendant and Leonard Simpson both testified that Duhon was armed and posed a threat to the defendant. It is well settled that the factfinder is free to accept or reject some, none, or all of any witness's testimony. Pursuant to *Kennerson* and the jurisprudence cited therein, we are unable to conclude the jury was unreasonable in accepting as credible the testimony of the witnesses who stated that Duhon did not pose a threat to the defendant, and in rejecting the conflicting testimony of the other witness and the defendant himself. We find, therefore, that the jury was not unreasonable in ultimately finding the defendant guilty as charged.

Accordingly, the assignment lacks merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR

In his supplemental brief to this court, the defendant asserts that the trial court erred in allowing the jury, during deliberations, to listen to an audio tape of his confession and to view written evidence without a waiver of his rights under La.Code Crim.P. art. 793.

Louisiana Code of Criminal Procedure article 793 provides that jurors must rely on their memories during deliberations, and that testimony shall not be repeated to the jury. Further, Article 793 permits the trial court to allow, upon the request of a juror, the physical examination of any object or document admitted into evidence, when that examination is necessary during the deliberative process.

In *State v. Broussard*, 598 So.2d 1302 (La.App. 3 Cir. 1992), this court recognized the policy basis of Article 793, as follows:

> Our Louisiana Supreme Court has made it abundantly clear that allowing a jury to review evidence or testimony such as audiotapes or transcripts during deliberations is reversible error because of the possibility that jurors might give undue weight to that limited portion of the oral testimony adduced at trial. *State v. Adams*, 550 So.2d 595 (La.1989); *State v. McCully*, 310 So.2d 833 (La.1975); *State v.*

8

*Freetime*, 303 So.2d 487 (La.1974), *appeal after remand*, 334 So.2d 207 (La.1976).

*Broussard*, 598 So.2d at 1303.

The supreme court discussed the requirements for waiving the statute in

*Adams*, 550 So.2d at 599:

> Because the statute contains prohibitory language, the trial judge has no discretion to make exceptions. "The general reason for the prohibition is a fear that jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them." *State v. Freetime*, 303 So.2d 487, 488 (La.1974), *aff'd after remand*, 334 So.2d 207 (La.1976). This court has held that the jury's review of written evidence for its verbal contents in violation of La.Code Crim.P. art. 793 constitutes reversible error. *State v. Perkins*, 423 So.2d 1103, 1110 (La.1982); *Freetime*, 303 So.2d at 490. Just as a party may knowingly and voluntarily waive his constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), parties may agree to waive a statutory provision such as La.Code Crim.P. art. 793. Such an agreement must be in clear express language and must be reflected in the record.

During deliberations, the jury asked for the audio recording of the defendant's

statement to the police and for all other evidence, except the photograph of the police

lineup. When the jury notified the trial judge of its request, the trial judge brought the

court into order. The following exchange took place between the trial judge, the

prosecuting attorney, Mr. Prather, and defense counsel, Mr. Register (emphasis

added):

> BY THE COURT: The jury has a question. We'll get the defendant in. We'll come to order and the defendant is present with his attorney. The jurors have sent in a note asking for exhibits. *Number 1 is the tape of the defendant's statement. Y'all want to send in the defendant's statement?*
>
> BY MR. PRATHER: It's been offered and introduced.
>
> BY MR. REGISTER: *I don't have a problem.*
>
> BY THE COURT: But do we send in the recorder with it?

9

BY MR. REGISTER:     *My only concern -- that's why -- I don't know if -- we didn't play the tape.*

BY THE COURT:     Right.

BY MR. REGISTER:     *But it is in evidence. So I don't know if we play it in open court or if they can take it in there. I don't think they can take a recorder in there.*

BY THE COURT:     That's my question about the recording. Do y'all want to bring them in and play it in the courtroom?

BY MR. PRATHER:     Whatever you want.

BY THE COURT:     Can y'all agree to that?

BY MR. REGISTER:     *That's fine. Or a transcript; I don't know -- followed by the transcript. That might be quicker. If the transcript is offered in evidence, could they take that with them? You want to do it that way?*

BY MR. PRATHER:     Yeah, but the transcript is not evidence.

BY THE COURT:     The transcript was not offered.

BY MR. REGISTER:     *Okay. Well, we're going to have to play the tape then.*

BY THE COURT:     So can y'all both agree to -- that we'll -- instead of letting it go in the jury room, that they can come out and we'll play it for them in the courtroom?

BY MR. PRATHER:     That's fine with me.

BY THE COURT:     Instead of having the tape recorder in the jury room. Okay. The other thing, they want the pictures of the crime scene and pictures of the victim. And they want the coroner's report. Now, there's no report, but there's a death certificate, right?

BY MR. PRATHER:     Right.

BY THE COURT:     *Should we send in the death certificate just with a note there's no coroner's report. Is that okay?*

BY MR. REGISTER:     *Right.*

BY MR. PRATHER:     That's correct.

BY THE COURT:     I'll put at the bottom there's no report, but that we're sending in the -- okay.

BY MR. PRATHER:     Now, if we're going to play the tape, Judge, you want me to get the system to play it because we have that upstairs?

BY THE COURT:     What?

BY MR. PRATHER:     If we're going to play the tape, you want me to get the system to play it?

BY THE COURT:     Right.

BY MR. REGISTER:     Your Honor, you said the pictures of the crime scene and what else? What crime scene pictures?

BY THE COURT:     Picture of the crime scene. I guess --

BY MR. PRATHER:     There's no pictures of the crime scene.

BY THE COURT:     What pictures are they talking about?

BY MR. REGISTER:     That's what I was trying -- pictures that I introduced or --

BY THE COURT:     One, two and three, I guess.

BY THE CLERK:     One, two and three are Mr. Register's pictures.

BY THE COURT:     You think that's what they're talking about?

BY MR. PRATHER:     Or the hand drawing if that's the crime scene. I don't know what --

BY MR. REGISTER:     *Give them everything.*

BY MR. PRATHER:     I'm happy with that, too.

BY THE COURT:     Is that all -- we'll send in all the exhibits?

BY MR. PRATHER:     The exhibits, all of them, the map, all that.

11

BY THE COURT: We don't need to send that in, the photo lineup.

BY MR. PRATHER: Photo lineup?

BY THE COURT: No.

BY MR. PRATHER: They didn't ask for it.

BY THE COURT: We'll send in the other exhibits. I'll put "No report" -- I just put, "No report, but there is Exhibit State 4, Death Certificate."

BY MR. REGISTER: Right.

(WHEREUPON, A BRIEF RECESS WAS TAKEN.)

AFTER RECESS

BY THE COURT: I'll just explain the procedure. The jury will come in -- without any statements by the attorneys, we're just going to -- by request of the jury, the tape of the defendant's statement will be played in open court. And y'all have agreed to that procedure?

BY MR. REGISTER: Yes, sir.

BY MR. PRATHER: Yes, Your Honor.

BY THE COURT: Then we'll send them back with the exhibits that we've agreed that they can take into the jury room. And I will explain to them that there is no coroner's report, but Exhibit 4 is a death certificate. We can bring them in.

(WHEREUPON, THE JURY WAS RETURNED TO THE COURTROOM.)

BY THE COURT: Before we give you the exhibits, you've requested the tape of the defendant's statement as per your request --

BY MR. PRATHER: Wait, there's two missing -- or one.

BY THE CLERK: It's just an extra chair.

BY THE COURT: Well, let's -- we should get that on the record. Do you waive polling of the jury?

BY MR. REGISTER: Yes.

12

BY MR. PRATHER:    Waive polling, Judge. The alternate is not present.

BY THE COURT:    Okay. But again, you requested some exhibits, which you'll be able to take into the jury room. But you also requested the tape. The tape will be played in open court. So we'll proceed to play the tape.

(WHEREUPON, THE TAPE RECORDED STATEMENT OF JUSTIN SAVOY WAS PLAYED.)

BY THE COURT:    Go ahead and hand the exhibits to Mr. Brasseaux. And the jury had requested a coroner's report. And there is no coroner's report in evidence. There's an exhibit. State Exhibit 4 is a death certificate. We can retire the jury.

(WHEREUPON, THE COURT WAS AT RECESS DURING DELIBERATIONS.)

It is clear that, when presented with the jury's request for the audiotape and other items of evidence, the defendant readily agreed that the evidence should be provided, only questioning the procedural method by which the jury should listen to the audiotape. Defense counsel expressly stated, when the discussion turned to which particular items they were requesting, that the court should "[g]ive them everything." We find this to be a clear and express waiver of the provisions of Article 793. We find, therefore, that having waived the provisions of Article 793, the defendant is precluded from raising this issue on appeal.

## CONCLUSION

The defendant's conviction and sentence are affirmed.

**AFFIRMED.**

13